Walter J. HICKEL, Governor of Alaska, State of Alaska, Tuckerman Babcock, Allen Vezey, Mary Lynne Wood, John C. Ingram, Robert Pickrell, Orie Williams, Fish and Game Fund, Petitioners,

v.

SOUTHEAST CONFERENCE, a nonprofit Alaska corporation, Peggy Ann McConnochie, Fred E. Reeder; Matanuska–Susitna Borough, Steve Cypra, Ted Smith, Al Jorgensen, Harold Newcomb, John Stein, Duncan Frazier, Gary Thurlow, Elsie O'Bryan, Ronda L. Kelley; Oliver Leavitt, Jacob Adams, George Ahmaogak, William Leavitt, Benjamin Nageak, Ronald Brower, Max Ahgeak, Charles D.N. Brower, Charles "Chuck" Greene, Roswell Schaeffer, Marie Greene, Reginald Cleveland, Charles Curtis, Willie Goodwin, Jr.; Mitchell A. Demientieff, Jerry Isaac, Leo Morgan, Nick Jackson, Clyde Peter; Alaska Democratic Party, Lidia L. Selkregg, Respondents.

SOUTHEAST CONFERENCE, a nonprofit Alaska corporation, Petitioners,

v.

Walter J. HICKEL, Governor of Alaska, State of Alaska, Respondents.

Nos. S–5093, S–5106, S–5154 and S–5156.

Supreme Court of Alaska.

Dec. 29, 1992.

As Modified on Denial of Rehearing March 12, 1993.

Virginia Ragle and Stephen C. Slotnick, Asst. Attys. Gen., Juneau, Mary A. Lundquist, Asst. Atty. Gen., Anchorage, Charles Cole, Atty. Gen., Juneau, for petitioners Walter J. Hickel, Governor of Alaska and State of AK.

Thomas M. Daniel, Perkins Coie, Anchorage, for petitioner Fish and Game Fund.

Myra M. Munson, Sonosky, Chambers, Sachse, Miller & Munson, Juneau, Donald J. Simon, Sonosky, Chambers, Sachse & Enderson, Washington, DC, for respondents Southeast Conference, et al. and Mat–Su Borough, et al.

David C. Crosby, Juneau, James Wickwire, Wickwire, Greene, Crosby & Seward, Seattle, WA, for respondents Leavitt, et al.

Don Clocksin, Wagstaff, Pope & Clocksin, Anchorage, for respondents Alaska Democratic Party, et al.

Michael J. Walleri, Tanana Chiefs Conference, Inc., Fairbanks, for respondents Demientieff, et al.

Robert P. Blasco and Mary A. Nordale, Robertson, Monagle & Eastaugh, Juneau, for amicus curiae Fairbanks North Star Borough.

Joel H. Bolger, Jamin, Ebell, Bolger & Gentry, Kodiak, for amicus curiae Kodiak Island Borough.

Kenneth P. Jacobus, Anchorage, for amicus curiae Constance Zawacki and The Republican Party of Alaska.

Michael W. Price, Groh, Eggers & Price, Anchorage, for amicus curiae Municipality of Anchorage.

Bruce Boltar, Dillingham, for amicus curiae Bristol Bay Native Ass'n.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

COMPTON, Justice.

At issue in this petition for review is the validity of the 1991 Proclamation of Reapportionment and Redistricting Plan (plan) issued by Governor Walter J. Hickel.

## I. FACTUAL AND PROCEDURAL BACKGROUND

■ Under the Alaska Constitution, the governor has the power and duty to reapportion the state legislature every ten years. Alaska Const. art. VI, § 3; *Wade v. Nolan*, 414 P.2d 689, 700 (Alaska 1966). In December 1990, Governor Hickel appointed a five member advisory reapportionment board (Board), as is required by article VI, section 8 of the Alaska Constitution. The Board was required to prepare and submit to the Governor a plan for reapportionment and redistricting following the reporting of the decennial census.[1]

In January 1991, the Board held an organizational meeting, elected Allen Vezey as chair and appointed Tuckerman Babcock as director. In March it adopted the following

policies to guide the development of redistricting plans:

* The population base is the 1990 population reported by the United States Census Bureau for the State of Alaska.

* The redistricting plan will be composed of single-member districts.

* One person, one vote: equal protection for all individuals will be realized by equal population among districts, with the least populated and most populated districts separated by a variance of no more than two percent.

* Federal Voting Rights Act: protect and enhance minority political voting strength by a non-retrogression policy and by considering individual linguistic and ethnic blocs.

* Alaska Constitution: compact, contiguous and relatively integrated socio-economic areas for House districts.

* Consider preservation of political subdivision boundaries.

* Consider public testimony, which will be incorporated into the record if received within 75 days after receipt of the United States Census PL94–171 data.

* Accept alternative plans submitted up to 60 days after receipt of the United States Census PL94–171 data for input into the state's computer system, if received in a form allowing direct input into the computer or on United States Geological Survey maps or United States Coast and Geodetic Survey maps.[2]

With the assistance of computer technology, which made possible more detailed analysis of potential redistricting than was previously available, the Board and its staff began forming a reapportionment plan based on the adopted policies. The

---

1. Article VI, section 10 of the Alaska Constitution provides as follows:

Within ninety days following the official reporting of each decennial census, the board shall submit to the governor a plan for reapportionment and redistricting as provided in this article. Within ninety days after receipt of the plan, the governor shall issue a proclamation of reapportionment and redistricting. An accompanying statement shall explain any change from the plan of the board. The reapportionment and redistricting shall be effective for the election of members of the legislature until after the official reporting of the next decennial census.

2. The Board later modified its policy regarding equal population among districts. It adopted a motion which directed the staff to:

Use up to a 10 percent variance in preparing the final three statewide alternative scenarios, for the purposes of compliance with the federal Voting Rights Act. Any other variance from the Board's two percent guideline must be justified by the need to comply with the Alaska Constitutional requirement that each district contain as nearly as possible a relatively integrated socio-economic area, or by limitations in the technology or data bases used by staff in preparing the statewide alternatives.

Board received the decennial census report from the United States Bureau of the Census in March 1991. The Board held a number of public hearings and reviewed alternative redistricting plans submitted by various interest groups. In June 1991, the Board delivered its report and proposed plan to the Governor.

On September 5, 1991, Governor Hickel issued his Proclamation of Reapportionment and Redistricting and Accompanying Statement. The final plan[3] included several relatively minor changes to the Board's proposed district boundaries. The proclamation directed the Attorney General to submit the plan to the United States Department of Justice for preclearance in accordance with section 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c (1988).[4]

Seven lawsuits were filed in superior court challenging the Governor's plan.[5] Two cases were dismissed with prejudice pursuant to stipulations. Five cases were consolidated for trial before Superior Court Judge Larry R. Weeks.[6]

After a sixteen day bench trial, Judge Weeks concluded that the Governor's plan was invalid because it violated the Alaska Constitution. Specifically, Judge Weeks concluded that the plan was not in compliance with article VI, section 6 of the Alaska Constitution because two of the districts were not "compact" and eight of the districts did not comprise "as nearly as practicable a relatively socio-economically integrated area." He determined that the Board "needlessly nullified Alaska constitutional requirements" in its attempt to reach its various policy goals, including the creation of districts with no more than two percent population deviation from the ideal

district size. He also concluded that the Board failed to give due consideration to the possibility of excluding non-resident military personnel from the population base, and that this failure was arbitrary and unreasonable. Judge Weeks held that the Board violated the Open Meetings Act, AS 44.62.310, but ruled that voiding the plan on the basis of this violation was not in the public interest. He also concluded that the Board violated the Public Records Act, AS 09.25.110–140, and the Procurement Code, AS 36.30.

Pursuant to Alaska Appellate Rule 402(a), Governor Hickel and the State of Alaska (State) petitioned this court for review, contending that Judge Weeks had erred: 1) in finding that the plan violated the equal protection clause of the Alaska Constitution; 2) in his interpretation of article VI, section 6 of the Alaska Constitution and in his determination that the plan violated this section; 3) in concluding that the Open Meetings Act, AS 44.62.310, and the Public Records Act, AS 09.25, applied to and were violated by the Governor's Advisory Reapportionment Board; and 4) in substituting his judgment for that of the Board with regard to matters within the Board's discretion.

We granted the State's petition to review the decision, and expedited the proceedings. On May 28, 1992, we concluded that the Governor's plan violated the Alaska Constitution. *See* Appendix B. We affirmed the superior court's findings of fact and conclusions of law that House Districts 1, 2, 3, 6, 26, 28, 34 and 35 violate requirements of article VI, section 6 of the Alaska Constitution. We also affirmed its holdings that the Open Meetings Act and the Public Records Act apply to the Board. However, we

---

3. The final plan which was reviewed in this case is attached as Appendix A. It contains detail maps of the Southeast and Matanuska–Susitna Borough Districts, as well as a statewide map.

4. In April 1992 the U.S. Department of Justice notified the State that it would not object to the Governor's plan.

5. Article VI, section 11 of the Alaska Constitution provides:

 *Enforcement.* Any qualified voter may apply to the superior court to compel the governor, by mandamus or otherwise, to perform his reapportionment duties or to correct any error in redistricting or reapportionment. . . .

 Original jurisdiction in these matters is hereby vested in the superior court. On appeal, the cause shall be reviewed by the supreme court upon the law and the facts.

6. The five cases which were consolidated included: *Alaska Democratic Party v. Hickel,* Case No. 3AN–91–8539 Civil; *Matanuska–Susitna Borough v. Hickel,* Case No. 3AN–91–8520 Civil; *Demientieff v. Hickel,* Case No. 4FA–91–1730 Civil; *Leavitt v. Hickel,* Case No. 2BA–91–81 Civil; and *Southeast Conference v. Hickel,* Case No. 1JU–91–1608 Civil. All parties participated fully in the trial before Judge Weeks.

reversed its holding that the Board's decision not to exclude non-resident military from the population base was arbitrary and unreasonable.

In a separate *Order of Remand*, later corrected, we directed the superior court to remand the case to the Board for formulation of a final plan. However, because of time constraints, we also directed the court to formulate an interim plan so that 1992 state elections might proceed in conformity with the requirements of the United States Constitution, the Alaska Constitution and the federal Voting Rights Act. Further, we authorized the court to employ experts or masters to assist in the formulation of an interim plan. *See* Appendix C.

Thereafter the superior court appointed three masters. After receiving instructions from the court[7] and reviewing alternative plans proposed by the parties, the masters presented a recommended interim plan to the court on June 14. In Orders dated June 18 and 19,[8] the superior court accepted the Masters' recommendation, with several modifications including a redrawing of the Fairbanks House Districts. The parties cross-petitioned this court for review of the court's orders. On June 25, after considering oral and written arguments, we granted the petition and affirmed the court's interim plan with modifications required by our determination that the court had erred in redrawing the Fairbanks House Districts.[9]

## II. LEGISLATIVE REAPPORTIONMENT

Now the goal of all apportionment plans is simple: the goal is adequate and true representation by the people in their elected legislature, true, just, and fair representation. And in deciding and in weighing this plan, never lose sight of that goal, and keep it foremost in your mind; and the details that we will present are merely the details of achieving true representation, which, of course, is the very cornerstone of a democratic government.

3 Proceedings of the Constitutional Convention (PACC) 1835 (January 11, 1956).

Legislative reapportionment is subject to a variety of legal requirements. The Federal Constitution, the Federal Voting Rights Act, and the Alaska Constitution all contain commands which guide the formation of a reapportionment plan. It is the interaction of these diverse and often diverging guidelines which makes reapportionment a difficult process. Because these guidelines sometimes lead in different directions, it is important to understand how they fit together.

### A. ARTICLE VI, SECTION 6 OF THE ALASKA CONSTITUTION.

The mandate for redistricting the election districts of the Alaska House of Representatives is found in article VI, section 6 of the Alaska Constitution:

The governor may further redistrict by changing the size and area of election districts, subject to the limitations of this article. Each new district so created shall be formed of contiguous and compact territory containing as nearly as practicable a relatively integrated socioeconomic area. Each area shall contain a population at least equal to the quotient obtained by dividing the total civilian population by forty. Consideration may be given to local government boundaries. Drainage and other geographic features shall be used in describing boundaries wherever possible.

■ Contiguity, compactness and relative socio-economic integration are constitutional *requirements. See Kenai Peninsula Borough v. State,* 743 P.2d 1352, 1360–61 (Alaska 1987) ("The state must consistently enforce the constitutional article VI, section 6 requirements of contiguity, compactness, and relative integration of socio-economic areas in its redistricting."). A

---

7. On June 11, 1992, we disapproved of Judge Weeks' instruction that wherever possible native influence districts must include a native population of at least 35%. *See* Appendix D.

8. These are attached as Appendices E and F, respectively.

9. *Our order of June 25, 1992 is attached as Appendix G. The map which depicts the interim plan of apportionment approved by this court on June 25, 1992, is attached as Appendix H.*

district lacking any one of these characteristics may not be constitutional under the Alaska Constitution.[10]

■ The requirements of contiguity, compactness and socio-economic integration were incorporated by the framers of the reapportionment provisions to prevent gerrymandering. 3 PACC 1846 (January 11, 1956) ("[The requirements] prohibit[ ] gerrymandering which would have to take place were 40 districts arbitrarily set up by the governor.... [T]he Committee feels that gerrymandering is definitely prevented by these restrictive limits."). Gerrymandering is the dividing of an area into political units "in an unnatural way with the purpose of bestowing advantages on some and thus disadvantaging others." [11] *Carpenter v. Hammond,* 667 P.2d 1204, 1220 (Alaska 1983) (Matthews, J., concurring). The constitutional requirements help to ensure that the election district boundaries fall along natural or logical lines rather than political or other lines.

### 1. *Contiguity.*

■ Contiguous territory is territory which is bordering or touching. As one commentator has noted, "[a] district may be defined as contiguous if every part of the district is reachable from every other part without crossing the district boundary (i.e., the district is not divided into two or more discrete pieces)." Grofman, *Criteria for Districting: A Social Science Perspective,* 33 UCLA L.Rev. 77, 84 (1985). Absolute contiguity of land masses is impossible in Alaska, considering her numerous archipelagos. Accordingly, a contiguous district may contain some amount of open sea. However, the potential to include open sea in an election district is not without limits. If it were, then any part of coastal Alaska could be considered contiguous with any other part of the Pacific Rim. To avoid this result, the constitution provides the additional requirements of compactness and socio-economic integration.

### 2. *Compactness.*

■ " 'Compact' in the sense used here means having a small perimeter in relation to the area encompassed." *Carpenter,* 667 P.2d at 1218 (Matthews, J., concurring). Compact districting should not yield "bizarre designs." *Davenport v. Apportionment Comm'n of New Jersey,* 124 N.J.Super. 30, 304 A.2d 736, 743 (N.J.Super.Ct.App.Div.1973), *quoted in Carpenter,* 667 P.2d at 1218–19 (Matthews, J., concurring). We will look to the relative compactness of proposed and possible districts in determining whether a district is sufficiently compact. *Carpenter,* 667 P.2d at 1218 (Matthews, J., concurring).

■ The compactness inquiry thus looks to the shape of a district. Odd-shaped districts may well be the natural result of Alaska's irregular geometry. However, "corridors" of land that extend to include a populated area, but not the less-populated

---

**10.** The requirement of relative socio-economic integration is given some flexibility by the constitution since districts need be integrated only "as nearly as practicable." Alaska Const. art. VI, § 6. However, the flexibility that this clause provides should be used only to maximize the other constitutional requirements of contiguity and compactness. The governor is not permitted to diminish the degree of socio-economic integration in order to achieve other policy goals.

**11.** Black's Law Dictionary defines gerrymandering as:

A name given to the process of dividing a state or other territory into the authorized civil or political divisions, but with such a geographical arrangement as to accomplish an ulterior or unlawful purpose, as, for instance, to secure a majority for a given political party in districts where the result would be otherwise if they were divided according to obvious natural lines.

*Black's Law Dictionary* (6th ed. 1990).

We have previously stated: "Gerrymandering is 'the deliberate and arbitrary distortion of district boundaries and populations for partisan or personal political purposes. The term 'gerrymandering,' however, is also used loosely to describe the common practice of the party in power to choose the redistricting plan that gives it an advantage at the polls.'" *Kenai Peninsula Borough,* 743 P.2d at 1367 n. 28 (quoting *Davis v. Bandemer,* 478 U.S. 109, 164, 106 S.Ct. 2797, 2826, 92 L.Ed.2d 85 (1986)) (citations omitted).

The word "gerrymandering" has an unusual etymology. The word derives from "the fancied resemblance to a salamander (made famous by caricature) of the irregularly shaped outline of an election district in northeastern [Massachusetts] that had been formed for partisan purposes in 1812 during [Elbridge] Gerry's governorship." *Webster's Third New International Dictionary* (3d ed. 1969).

land around it, may run afoul of the compactness requirement. Likewise, appendages attached to otherwise compact areas may violate the requirement of compact districting.

### 3. *Socio-economic Integration.*

■ In addition to preventing gerrymandering, the requirement that districts be composed of relatively integrated socio-economic areas helps to ensure that a voter is not denied his or her right to an equally powerful vote.

> [W]e should not lose sight of the fundamental principle involved in reapportionment—truly representative government where the interests of the people are reflected in their elected legislators. Inherent in the concept of geographical legislative districts is a recognition that areas of a state differ economically, socially and culturally and that a truly representative government exists only when those areas of the state which share significant common interests are able to elect legislators representing those interests. Thus, the goal of reapportionment should not only be to achieve numerical equality but also to assure representation of those areas of the state having common interests.

*Groh v. Egan,* 526 P.2d 863, 890 (Alaska 1974) (Erwin, J., dissenting).

We have looked before to the Minutes of the Constitutional Convention for guidance in defining "relatively integrated socio-economic area." *Kenai Peninsula Borough,* 743 P.2d at 1360 n. 11; *Carpenter,* 667 P.2d at 1215; *Groh,* 526 P.2d at 878. The delegates explained the "socio-economic principle" as follows:

> [W]here people live together and work together and earn their living together, where people do that, they should be logically grouped that way.

3 PACC 1836 (January 11, 1956). Accordingly, the delegates define an integrated socio-economic unit as:

> an economic unit inhabited by people. In other words, the stress is placed on the

canton idea, a group of people living within a geographic unit, socio-economic, following if possible, similar economic pursuits.

3 PACC 1873 (January 12, 1956).

In order to satisfy this constitutional requirement, the Governor must provide "sufficient evidence of socio-economic integration of the communities linked by the redistricting, proof of actual interaction and interconnectedness rather than mere homogeneity." *Kenai Peninsula Borough,* 743 P.2d at 1363. In areas where a common region is divided into several districts, significant socio-economic integration between communities within a district outside the region and the region in general "demonstrates the requisite interconnectedness and interaction,". even though there may be little actual interaction between the areas joined in a district. *Id.* (declining to draw a fine distinction between the interaction of North Kenai with Anchorage and North Kenai with South Anchorage). "The sufficiency of the contacts between the communities involved here can be determined by way of comparison with districts which we have previously upheld." *Id.* A district will be held invalid if "[t]he record is simply devoid of significant social and economic interaction" among the communities within an election district. *Carpenter,* 667 P.2d at 1215.

In our previous reapportionment decisions we have identified several specific characteristics of socio-economic integration. In *Kenai Peninsula Borough,* we found that service by the state ferry system, daily local air taxi service, a common major economic activity, shared fishing areas, a common interest in the management of state lands, the predominately Native character of the populace, and historical links evidenced socio-economic integration of Hoonah and Metlakatla with several other southeastern island communities.[12] 743 P.2d at 1361.

---

**12.** We did not decide whether these characteristics were specifically necessary to pass muster under article VI, section 6 of the Alaska Constitution. Instead we merely found that a rational state policy existed in effectuating the constitutional mandate of relative socio-economic intervention. *Kenai Peninsula Borough,* 743 P.2d at 1361.

In the same case, we found it persuasive that North Kenai and South Anchorage were geographically proximate, were linked by daily airline flights, shared recreational and commercial fishing areas, and were both strongly dependent on Anchorage for transportation, entertainment, news and professional services. *Id.* at 1362–63.

In *Groh,* we stated that "patterns of housing, income levels and minority residences" in an urban area "may form a basis for districting, [although] they lack the necessary significance to justify" large population variances. 526 P.2d at 879. We identified transportation ties, namely ferry and daily air service, geographical similarities and historical economic links as more significant factors. *Id.* (holding that a district in southeast Alaska comprising the mainland communities of Juneau, Haines and Skagway was sufficiently integrated, considering that the rest of Southeast was island oriented).

■ The Alaska Constitution requires districts comprising "relatively integrated" areas. Alaska Const. art. VI, § 6. Petitioners argue that the term "relatively" diminishes the degree of socio-economic integration required within an election district. We are urged to compare all proposed districts with a hypothetical completely unintegrated area, as if a district including both Quinhagak and Los Angeles had been proposed. We decline to adopt petitioners' interpretation of this provision.

"Relatively" means that we compare proposed districts to other previously existing and proposed districts as well as principal alternative districts to determine if socio-economic links are sufficient. "Relatively" does not mean "minimally," and it does not weaken the constitutional requirement of integration.

## B. EQUAL PROTECTION.

"In the context of voting rights in redistricting and reapportionment litigation, there are two principles of equal protection, namely that of 'one person, one vote'—the right to an equally weighted vote—and of 'fair and effective representation'—the right to group effectiveness or an equally powerful vote." *Kenai Peninsula Borough,* 743 P.2d at 1366. The former is quantitative, or purely numerical, in nature; the latter is qualitative. *Id.* at 1366–67.

The equal protection clause of the Alaska Constitution[13] has been interpreted along lines which resemble but do not precisely parallel the interpretation given the federal clause.[14] While the first part, "one person, one vote," has mirrored the federal requirement, *see, e.g., Groh,* 526 P.2d at 875, the second part, "fair and effective representation," has been interpreted more strictly than the analogous federal provision.

### 1. *One Person, One Vote.*

"[A] State [must] make an honest and good faith effort to construct districts, in both houses of its legislature, as nearly of equal population as is practicable." *Reynolds v. Sims,* 377 U.S. 533, 577, 84 S.Ct. 1362, 1389, 12 L.Ed.2d 506 (1964), *quoted in Kenai Peninsula Borough,* 743 P.2d at 1358. "Whatever the means of accomplishment, the overriding objective must be substantial equality of population among the various districts, so that the vote of any citizen is approximately equal in weight to that of any other citizen in the state." *Reynolds,* 377 U.S. at 579, 84 S.Ct. at 1390.

■ We discussed the Supreme Court's equal population requirement of "substantial equality" in *Kenai Peninsula Borough:*

Under a "one person, one vote" theory, "minor deviations from mathematical equality among state legislative districts are insufficient to make out a prima facie

---

**13.** The Alaska Equal Protection clause provides that "all persons are equal and entitled to equal rights, opportunities, and protection under the law...." Alaska Const. art. I, § 1.

**14.** The Federal Equal Protection clause provides that "No state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const.Amend. XIV, § 1.

case of invidious discrimination under the Fourteenth Amendment so as to require justification by the State." ... [A]s a general matter an apportionment plan containing a maximum population deviation under 10% falls within the category of minor deviations. The state must provide justification for any greater deviation.

743 P.2d at 1366 (quoting *Gaffney v. Cummings*, 412 U.S. 735, 745, 93 S.Ct. 2321, 2327, 37 L.Ed.2d 298 (1973)) (citations omitted).[15] Thus, we have recognized that the effectuation of the article VI, section 6 requirements will justify population deviations greater than 10 percent. *Id.* 743 P.2d at 1360. Accordingly, as a matter of federal constitutional law the Governor may in good faith declare election districts with a maximum population deviation greater than 10 percent, *if* such deviations are a result of the creation of contiguous, compact and relatively socio-economically integrated areas.[16]

 We have identified several other state policies which may also justify a population deviation greater than 10 percent. We noted that a state's desire to maintain political boundaries is sufficient justification provided this principle is consistently applied. *Kenai Peninsula Borough*, 743 P.2d at 1360. Similarly, we implied that adherence to Native corporation boundaries might also provide justification, as long as the boundaries were adhered to consistently. *Groh*, 526 P.2d at 877–78 (holding that the utilization of a portion of the Calista corporate boundary as a district boundary was not an adequate justification where the Calista region was otherwise fractionated by the reapportionment plan).[17]

On the other hand, we have rejected several policies as inadequate justifications for population deviation. We held that the "mining potential in the [Nome] area and the need for a 'common port facility'" did not justify a 15 percent overrepresentation where "the makeup of the population both to the north and the east [did] not vary significantly from that of the adjoining villages within the Nome [election district] boundaries." *Groh*, 526 P.2d at 877.

### 2. *Fair and Effective Representation.*

 In addition to the guarantee of substantial mathematical equality, the Equal Protection Clause of the United States Constitution provides for the more

---

**15.** We also articulated this theory in *Groh:*

> We conclude that in the absence of a showing that the manner of reapportioning a state was improperly motivated or had an impermissible effect, deviations of up to ten percent require no showing of justification. The state, however, has the burden of showing that deviations in excess of ten percent are "based on legitimate considerations incident to the effectuation of a rational state policy."

526 P.2d at 877 (quoting *White v. Regester*, 412 U.S. 755, 764, 93 S.Ct. 2332, 2338–39, 37 L.Ed.2d 314 (1973)) (footnote omitted).

**16.** In *Mahan v. Howell*, the United States Supreme Court approved a deviation of 16.4 percent based on the preservation of political subdivision boundaries. 410 U.S. 315 (1973). That deviation has been seen by many as the outer limit which the Supreme Court will allow. *See Travis v. King*, 552 F.Supp. 554, 562 (D.Haw. 1982).

**17.** We recognized in *Groh* that it was reasonable to avoid combining two areas populated by residents who had a history of conflict. We rejected the suggestion that this factor alone justified the underpopulation of the district comprised of one of these areas. We noted that no explanation had been offered "why other areas could not have been added to the district so as to create less of a variance." 526 P.2d at 878. Upon objection to the redistricting plan, however, we found sufficient justification for the Board's overrepresentation of District 16 (Bristol Bay):

> It is now apparent that the only alternative to the Board's original districting of that area is to disregard an impassible mountain range, the natural barrier formed by Cook Inlet, the lack of direct transportation or communication links, the corporate boundaries of the Kenai Peninsula Borough, the cohesiveness of interests of residents of that Borough and the disparate interests of the population of the Bristol Bay area. We now find that legitimate considerations incident to the implementation of rational state policy justify the overrepresentation of House District No. 16 (Bristol Bay) as originally designated and override mathematical requirements.

*Id.* at 879. Given the lack of reasonable alternatives to the initial plan, as well as the Board's

nebulous guarantee of fair representation. Under this qualitative principle, certain mathematically palatable apportionment schemes will be overturned because they systematically circumscribe the voting impact of specific population groups. This principle recognizes the danger that racial and political groups will be "fenced out of the political process and their voting strength invidiously minimized." *Gaffney v. Cummings*, 412 U.S. 735, 754, 93 S.Ct. 2321, 2332, 37 L.Ed.2d 298 (1973).

■ A plurality of the United States Supreme Court has indicated that a mere lack of proportional representation will be insufficient to support a finding of unconstitutional vote dilution. Plaintiffs must prove both intentional discrimination against a group and a discriminatory effect on that group.[18] *Davis v. Bandemer*, 478 U.S. 109, 127, 106 S.Ct. 2797, 2807, 92 L.Ed.2d 85 (1986). In addition, the plurality opinion requires a showing of a pattern of discrimination:

> In this context, such a finding of unconstitutionality must be supported by evidence of continued frustration of the will of a majority of the voters or effective denial to a minority of voters of a fair chance to influence the political process.

*Id.* at 133, *quoted in Kenai Peninsula Borough*, 743 P.2d at 1369. Thus, under the qualitative principle of federal equal protection, fair representation is denied where there is "proof that the group has been consistently and substantially excluded from the political process [and] denied political effectiveness over a period of more than one election." *Kenai Peninsula Borough*, 743 P.2d at 1369.

■ The equal protection clause of the Alaska Constitution imposes a more strict standard than its federal counterpart. *Ke-*

nai Peninsula Borough, 743 P.2d at 1371; *Isakson v. Rickey*, 550 P.2d 359, 362–63 (Alaska 1976) (requiring a more flexible and demanding standard and noting that the court "will no longer hypothesize facts which would sustain otherwise questionable legislation as was the case under the traditional rational basis standard"). In the context of reapportionment, we have held that upon a showing that the Board acted intentionally to discriminate against the voters of a geographic area, the Board must demonstrate that its plan will lead to greater proportionality of representation. *Kenai Peninsula Borough*, 743 P.2d at 1372. Because of the more strict standard, we do not require a showing of a pattern of discrimination, and do not consider any effect of disproportionality de minimis when determining the legitimacy of the Board's purpose. *Id.*

### C. VOTING RIGHTS ACT.

■ The Federal Voting Rights Act, 42 U.S.C. § 1973 (1988), also plays a significant role in the reapportionment of state election districts. The purpose of this Act is to protect the voting power of racial minorities: "Under section 5 of the Act, a reapportionment plan is invalid if it 'would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.'" *Kenai Peninsula Borough*, 743 P.2d at 1361 (quoting *Beer v. United States*, 425 U.S. 130, 141, 96 S.Ct. 1357, 1363–64, 47 L.Ed.2d 629 (1976)); 42 U.S.C. § 1973c (1988). We have noted that compliance with section 5 is a legitimate goal of a Reapportionment Board: "A state may constitutionally reapportion districts to enhance the voting strength of minorities in order to facilitate compliance with the Vot-

---

good faith effort in adding to the district, we reversed our initial order invalidating the plan.

**18.** In the context of discrimination against a political group, the intent requirement is probably minimal. As Justice White noted in *Bandemer*, "As long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended." 478 U.S. at 129. *See* Laurence H. Tribe, American Constitutional Law § 13–9, at 1082 n. 9 (2d ed. 1988).

The Supreme Court has also required a showing of discriminatory intent in the context of discrimination against a racial group. *Mobile v. Bolden*, 446 U.S. 55, 62, 66, 100 S.Ct. 1490, 1497, 1499, 64 L.Ed.2d 47 (1980). However, Congress responded to the *Bolden* decision by amending section 2 of the Voting Rights Act so as to do away with the intent requirement. Voting Rights Act Amendments of 1982, Pub.L. No. 97–205, § 3, 96 Stat. 134. *See* L. Tribe, *supra,* § 13–8, 1078–80.

ing Rights Act." *Kenai Peninsula Borough,* 743 P.2d at 1361.

Section 2 of the Act, as amended in 1986, creates a cause of action to remedy the use of certain electoral laws or practices which, when interacting with social and historical conditions, create an inequality in the opportunities enjoyed by voters to elect their preferred representatives. *Thornburg v. Gingles,* 478 U.S. 30, 47, 106 S.Ct. 2752, 2764–65, 92 L.Ed.2d 25 (1986). Plaintiffs may have a redistricting plan or an election invalidated if they can prove that 1) under the totality of the circumstances, the redistricting results in unequal access to the electoral process; and 2) racially polarized bloc voting exists. "[T]he conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation." *Id.* at 46, 106 S.Ct. at 2764.

In each of our previous reapportionment decisions we have noted the difficulty in drawing election districts in Alaska. We have emphasized the need to preserve flexibility in the redistricting process so that all constitutional requirements may be satisfied as nearly as practicable.

At the outset we recognize the difficulty of creating districts of equal population while also conforming to the Alaska constitutional mandate that the districts "be formed of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area." When Alaska's geographical, climatical, ethnic, cultural and socio-economic differences are contemplated the task assumes Herculean proportions commensurate with Alaska's enormous land area. The problems are multiplied by Alaska's sparse and widely scattered population and the relative inaccessibility of portions of the state. Surprisingly small changes in district boundaries create large percentage variances from the ideal population.

. . . .

When confronted with conditions so different from those of any other single state in the continental United States, it is readily apparent that it becomes well nigh impossible to achieve the mathematical precision of equal proportions which is feasible in those other states.

*Egan v. Hammond,* 502 P.2d 856, 865–66 (Alaska 1972) (footnotes omitted) (quoting Alaska Const. art VI, § 6), *quoted in Groh,* 526 P.2d at 875 *and Kenai Peninsula Borough,* 743 P.2d at 1359.

Thus, although the Board and the Governor are free to pursue their own policies and goals in recommending and declaring redistricting and reapportionment, such policies may not be pursued at the expense of the federal and Alaska constitutional and statutory mandates.

## III. REGIONAL APPLICATIONS

### A. SOUTHEAST ALASKA.

Under the Governor's reapportionment plan, southeast Alaska (Southeast) was divided into five election districts, designated 1 through 5.[19] Respondent Southeast Conference contends that Districts 1, 2 and 3 violate article VI, section 6 of the Alaska Constitution. The trial court agreed, finding specifically that "The districts of Southeast are not socio-economically integrated and they easily could have been." We affirm this conclusion.

District 1 includes most of the Ketchikan Gateway Borough, the City of Wrangell and the eastern half of Prince of Wales Island. District 2 includes most of Sitka and the cities of Haines and Petersburg. District 3 includes the downtown portions of Sitka and Ketchikan, the City of Saxman, the communities of Annette, Metlakatla, Hydaburg, Craig, Point Baker, Port Armstrong, Pelican and Yakutat. As such, it includes parts of Chichagof, Baranof, Admiralty, Kupreanof, Prince of Wales and Revillagigedo Islands. District 3 stretches almost the entire length of Southeast from Annette to Yakutat.

The districts created by the Governor's plan do not take into account several local municipal boundaries. The plan separates

19. *See* page 2 of Appendix A.

the downtowns of two major cities from the rest of the cities (Sitka and Ketchikan). It also splits two closely interrelated cities, Ketchikan and Saxman. Further, the plan ignores natural geographic boundaries by splitting all of the major islands of the Alexander Archipelago.

 Article VI, section 6 does not require that districts be drawn along municipal boundaries. Rather, the provision states only that "[c]onsideration may be given to local government boundaries." Alaska Const. art. VI, § 6. However, local boundaries are significant in determining whether an area is relatively socio-economically integrated. By statute, a borough must have a population which "is interrelated and integrated as to its social, cultural, and economic activities." AS 29.05.031.[20]

Divisions of Ketchikan and Sitka are not permissible unless the resulting districts evidence a pattern of relative socio-economic integration. The resulting District 3 is not composed of relatively integrated socio-economic areas. District 3 mixes the small, rural, Native communities with the urban areas of Ketchikan and Sitka. These rural and urban communities have different social concerns and political needs. Logical and natural boundaries cannot be ignored without raising the specter of gerrymandering.

The Ketchikan Gateway Borough has a population of 13,828, only 71 people above the ideal district size. Saxman, part of the Borough, is more socio-economically integrated with the City of Ketchikan than it is with other Native communities of the Southeast islands.[21] Prince of Wales Island is likewise more socio-economically integrated as a whole than it is relative to the rest of District 3 in which the western half of the island was placed.

 The Board cited the Voting Rights Act as its justification in creating District 3. District 3 was meant to be a Native influence district. The proposed configuration of District 3 raised the Native percentage of the district two percentage points compared to the old "Islands District." However, such an awkward reapportionment of the Southeast Native population was not necessary for compliance with the Voting Rights Act.[22] An "Island" District

20. Although a reapportionment plan may split boroughs in forming election districts, the division of a borough which otherwise has enough population to support an election district will be an indication of gerrymandering. There must be some legitimate justification for not preserving the government boundaries in such a case.

21. The city of Saxman urged the governor not to split Saxman from the rest of the Borough. The Ketchikan Indian Corporation, the Sealaska Corporation and the Grand Camp of the Alaska Native Brotherhood all objected to the Governor's planned splitting of the Borough.

22. Our conclusion underscores the error in the Board's methodology in reconciling the requirements of the Voting Rights Act with the requirements of the Alaska Constitution. The Board was advised to expect that any challenges to the reapportionment plan would come under the newly amended section 2 of the Voting Rights Act. Consequently, the Board accorded minority voting strength priority above other factors, including the requirements of article VI, section 6 of the Alaska Constitution. This methodology resulted in proposed district 3, a district which does not comply with the requirements of the Alaska Constitution. However, proposed district 3 is not required by the Voting Rights Act, either.

Article VI, cl. 2 of the United States Constitution provides that "This Constitution, and the laws of the United States which shall be made in pursuance thereof ... shall be the supreme law of the land...." This mandates that provisions of state law, including state constitutional law, are void if they conflict with federal law. To the extent that the requirements of article VI, section 6 of the Alaska Constitution are inconsistent with the Voting Rights Act, those requirements must give way. However, to the extent that those requirements are not inconsistent, they must be given effect. The Voting Rights Act need not be elevated in stature so that the requirements of the Alaska Constitution are unnecessarily compromised.

The Board must first design a reapportionment plan based on the requirements of the Alaska Constitution. That plan then must be tested against the Voting Rights Act. A reapportionment plan may minimize article VI, section 6 requirements when minimization is the only means available to satisfy Voting Rights Act requirements.

In our order of June 8, 1992, we directed that the superior court, in drafting an interim plan, give priority to the Voting Rights Act over the requirements of article VI, section 6 of the Alaska Constitution. In that context, expediency mandated that an interim plan be formulated in

can be configured which satisfies the requirements of the Voting Rights Act and which is more compact and better integrated socially.[23]

 Thus, Districts 1, 2 and 3 all violate article VI, section 6 of the Alaska Constitution. These districts do not contain, as nearly as practicable, relatively integrated socio-economic areas, identified with due regard for local governmental and geographic boundaries. Although these boundaries need not necessarily be followed in creating election districts, they must be considered by the Board in so far as they indicate the true socio-economic integration of several areas.

### B. MATANUSKA–SUSITNA BOROUGH.

The Matanuska–Susitna (Mat–Su) Borough was divided among five house districts, designated 6, 26, 27, 28 and 34.[24] Only District 27 is wholly composed of land within the Mat–Su Borough. District 6 groups Palmer with Prince William Sound. District 26 groups the residential neighborhoods between Palmer and Wasilla with Chugiak and the northern communities of the Municipality of Anchorage. District 28, stretching to the Canadian border, comprises interior Ahtna areas and parts of the Gulkana and Copper River valleys. It includes Glennallen, Tok and Delta Junction. It also includes a narrow corridor which reaches into the Mat–Su Borough, and encompasses the outskirts of Palmer and Wasilla.[25] District 34 combines Willow, Talkeetna and a large portion of the rural northern part of the Mat–Su Borough with

a majority of the Denali Borough and a part of the Fairbanks North Star Borough that includes the communities of North Pole, Salcha and Eielson Air Force Base.

As noted above, a borough is by definition socio-economically integrated. It is axiomatic that a district composed wholly of land belonging to a single borough is adequately integrated. Thus, District 27 complies with that requirement.

 We recognize that it may be necessary to divide a borough so that its excess population is allocated to a district situated elsewhere. However, where possible, all of a municipality's excess population should go to one other district in order to maximize effective representation of the excess group.[26] This result is compelled not only by the article VI, section 6 requirements, but also by the state equal protection clause which guarantees the right to proportional geographic representation. *See Kenai Peninsula Borough v. State*, 743 P.2d 1352, 1369, 1372–73 (Alaska 1987) (stating that a primary indication of intentional discrimination against a geographic region was a lack of adherence to established political subdivision boundaries).

In this case, the Mat–Su Borough population is allocated between five districts. With the exception of District 27, the resulting districts have serious shortcomings in their resulting relative socio-economic integration.

District 6 merges Palmer with the Prince William Sound communities. Palmer is the governmental center of the Mat–Su Borough, an established agricultural area. In

time for the 1992 elections, and that compliance with the Voting Rights Act be ensured. In drafting a permanent plan, however, the Board's design will not be compelled by expediency. The Board shall ensure that the requirements of article VI, section 6 of the Alaska Constitution are not unnecessarily compromised by the Voting Rights Act.

23. The Island District approved by this court as part of the 1992 interim plan excludes the urban areas of Ketchikan and Sitka and respects all local government boundaries in Southeastern Alaska. While it is not compact, non-compactness appears to be necessary in order to comply with the Voting Rights Act and it is, in any case,

more compact than the proposed configuration of District 3. *See* Appendix H.

24. *See* page 3 of Appendix A.

25. Because of this corridor, District 28 became known as and is referred to in briefing as the "Oosik District."

26. Dividing the municipality's excess population among a number of districts would tend to dilute the effectiveness of the votes of those in the excess population group. Their collective votes in a single district would speak with a stronger voice than if distributed among several districts.

contrast, the Prince William Sound communities are oriented toward commercial fishing and maritime activities. The record does not establish any significant interaction or interconnectedness between these areas. Further, Palmer is part of an organized borough whereas Prince William Sound is not. Because of this factor, the interests of Palmer residents may be adverse to those of the residents of an unorganized borough on issues such as property taxes and state funding of programs such as education.

There is evidence of some socio-economic interaction between the Mat–Su Borough areas and the Anchorage areas of District 26. However, considerable testimony indicated that the Mat–Su residents were more naturally linked to Palmer and Wasilla than they were to Anchorage. Moreover, we find it significant that Palmer, Wasilla and the area between them were placed in three separate districts despite the fact that these communities share most of their public facilities.

District 28 also does not contain relatively socio-economically integrated areas. As above, the record simply does not establish significant social or economic interaction between the connected areas. In addition, District 28 combines a region of Mat–Su with an unorganized borough, and includes part of the primarily rural Denali Borough. District 28 also fails for its lack of compactness. The corridor which extends into the Mat–Su Borough was prompted by a desire to attain mathematical equality among legislative districts. However, we have previously noted that population deviations up to 10 percent require no justification and that the Board may use larger deviations in order to effectuate the requirements of article VI, section 6. *Kenai Peninsula Borough v. State,* 743 P.2d 1352, 1260 (Alaska 1987). The Board's failure to create a compact district is not justified by rigid adherence to mathematical equality.

27. *See* page 1 of Appendix A.

28. The district includes the Koyukuk River valley, much of the area drained by the Yukon River from a point upstream from Russian Mis-

District 34 fails for its lack of relative socio-economic integration. This district links two areas with almost no social or economic interaction. Moreover, the Mat–Su Borough communities in this district are rural and thus share few common interests with the suburban Fairbanks and military areas of the Fairbanks North Star Borough.

■ We thus hold that the configuration dividing the Mat–Su Borough among five districts is invalid. The Governor's plan unfairly dilutes the proportional representation the residents of the Mat–Su Borough are guaranteed. A municipality should not be made to contribute so much of its population to districts centered elsewhere that it is deprived of representation which is justified by its population. The plan also results in four districts which are not relatively socio-economically integrated and one district which is not sufficiently compact.

### C. ELECTION DISTRICT 35.

■ Under the Board's plan, District 35 encompasses a vast portion of interior and northern Alaska.[27] Its boundaries extend from Point Hope on the northwest coast to the border of Alaska and Canada on the east, and from Barrow in the north to Tyonek in the south. Thus constructed, District 35 also includes the area between the Brooks Range and the Arctic Ocean, which is commonly referred to as the North Slope, and traditionally inhabited by the Inupiaq Eskimo. To the south, District 35 extends across the Brooks Range to include much of the sparsely populated river drainages of interior Alaska[28] traditionally inhabited by the Athabaskan Indians.

Judge Weeks described the joining of the North Slope Inupiaq and the Interior Athabaskan areas into one district as "probably the single worst combination that could be selected if a board were trying to maximize socio-economic integration in Alaska." The linkage of these geographically divided and

sion to the Canadian border, and much of the Kuskokwim River drainage upstream from a point near Stony River.

culturally distinct areas has been described as a "worst case scenario."

The record indicates that the Board formed the boundaries of District 35 with little consideration of the relative socio-economic integration of the people who live there. Board Chair Vezey testified that he placed little reliance on a socio-economic study of the area. Mr. Vezey also noted that there was no testimony from Inupiaq or Athabaskan witnesses favoring linkage of the areas. Further, Board member Pickrell recalled no discussion by the Board regarding joining the Inupiaq and Athabaskan areas.

The record also demonstrates minimal past and present socio-economic integration between the Inupiaq and Athabaskan cultures. Brenda Itta–Lee, an Inupiaq community leader from Barrow, and Georgianna Lincoln, a representative in the state legislature and Athabaskan community leader from Rampart, both testified regarding the physical separation of the two cultures and the historical, linguistic and economic differences between the cultures. Evidence introduced at trial indicates that the average annual per capita resident income on the North Slope exceeds $26,000 while in the Doyon Athabaskan region the average is less than $6000. Social scientists who testified at trial described the actual socio-economic integration between the Inupiaq and Athabaskan as insignificant.

Based on the record, we conclude that District 35 violates article VI, section 6 of the Alaska Constitution because it does not encompass, as nearly as practicable, a relatively integrated socio-economic area.

## D. THE ALEUTIAN ISLANDS.

■ The Board's plan divides the Aleutian Islands between two districts.[29] The eastern Aleutians are in District 39, and the western Aleutians in District 37. On its face this severance violates the contiguous territory requirement of article VI, sec-

tion six of the Alaska Constitution.[30] Although the parties did not raise this issue, the separation of the Aleutian Islands is so plainly erroneous that we address the issue *sua sponte*. Thus, in exercise of our authority under article IV, section two of the Alaska Constitution, we hold that the separation of the Aleutian Islands into two districts violates article VI, section six of the Alaska Constitution.

## IV. POPULATION BASE

The Board used the 1990 census as its population base. However, the Board did not subtract from the census data military personnel who were stationed in Alaska at the time the census was taken, but who did not consider themselves Alaska residents. The Governor did not vary the population base from the Board's recommendation.

■ Previously we held that the exclusion of non-resident military personnel (NRMP) from the population base is constitutionally permissible. However, we have never decided whether exclusion was constitutionally required. We have not addressed this issue before because NRMP have been excluded from the population base in every previous district reapportionment, with the exception of the interim plan we devised for the 1972 elections following *Egan v. Hammond*, 502 P.2d 856, 870 (Alaska 1972).

The state argues that the inclusion of NRMP was a policy choice it was allowed to make, and that we should defer to that choice. The state argues further that inclusion of NRMP is permissible because it is impossible to accurately estimate the number of military personnel who are not residents. It notes that this question is different with this reapportionment because the United States Army and Air Force no longer make personnel data available to the state. The state maintains that in light of this, it acted within its discretion

29. *See* page 1 of Appendix A.

30. In our order of remand, we noted that the Aleutians must be joined together in one district unless their separation is mandated by federal

law. Since federal law does not mandate their separation, the contiguous territory requirement of the Alaska Constitution controls.

by including all military personnel in the population base.[31]

The respondents argue that exclusion is constitutionally required since inclusion would violate the reapportionment provisions and the equal protection clause of the Alaska Constitution. They argue that the effect of the inclusion is the dilution of the voting power of residents of areas of Alaska without large military populations.

In *Egan*, we implemented an interim plan without a NRMP exclusion because "it was not possible to compile sufficiently accurate data to provide a reasonable basis for excluding any number of military from the population base." 502 P.2d at 870. However, we also recognized "the need for a permanent plan which achieves a level of accuracy of [the military population's] voting participation which is closer than either including or excluding all military as a class."[32] 502 P.2d at 870. "[T]he challenge is to arrive at the best approximation of the population to be counted without losing sight of the fact that the right of equal representation is also an individual and personal right." *Egan*, 502 P.2d at 869.

We therefore hold that exclusion is not constitutionally required if it is not possible to accurately identify those military personnel who are non-residents.[33] However, it is necessary to consider alternative plans for obtaining a sufficiently accurate plan for estimating the number of NRMP. *Id.* (noting that it was "incumbent upon [this court] to discuss alternative plans which may be available to handle the problem"). *See also Groh v. Egan*, 526 P.2d 863, 868

(Alaska 1974) (finding that the Board's careful examination of alternatives supported the conclusion that the state's choice of population base was rational).

The key determination is whether the Board's efforts in "discussing the alternatives" were sufficient to support its conclusion that compiling accurate data was impossible. The trial court found that a "hard look" was required. The hard look requirement is consistent with our previous acknowledgment that the state has a compelling interest in attempting to exclude NRMP. *Carpenter*, 667 P.2d at 1213 (identifying the "compelling state interest" as "the prevention of the dilution of its residents' voting strength"). *See also Reynolds v. Sims*, 377 U.S. 533, 555, 84 S.Ct. 1362, 1378, 12 L.Ed.2d 506 (1964) ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

Judge Weeks identified six "legitimate reasons" for including the NRMP. He also found that although the extent of non-residency among the military was determinable, it was unclear whether it was possible to make a reliable determination of the enumeration districts in which non-resident, off-base military personnel lived. Despite these findings, he concluded that the Board did not take a "hard look" at this issue. The inclusion of all military personnel in the population base was thus not justifiable.

Judge Weeks apparently believed that the reasons stated by the Board for includ-

---

**31.** The Board was advised that it would be extremely difficult to accurately identify the NRMP because the U.S. census allowed certain military personnel to allocate themselves to other states. Further, they were told that the United States Army and Air Force would no longer release residency information because of the Privacy Act and Civil Rights Act. The Board was also advised that it might face Department of Justice preclearance problems if the NRMP were included.

**32.** This need was recognized in light of the threat of "unbalanced representation" resulting from the inclusion of NRMP. *Egan*, 502 P.2d at 870. Thus the constitutional concern is one of

equal protection. The reapportionment provisions favor the use of census data. "Alaska's constitution requires that the requisite population total be arrived at by use of the census data. It does not mandate a population base composed exclusively of registered voters, citizens who have previously voted in Alaska, or only those people living in Alaska with the intention of making Alaska their home." *Id.* at 861.

**33.** However, the estimation of the percentage of NRMP need not be any more precise than the approximation of other portions of the population base. *See Egan*, 502 P.2d at 869.

ing NRMP were post hoc justifications. Also he found it significant that the Board's legal advisor advised strongly to exclude NRMP.

At its March 4, 1991 meeting, the Board adopted the policy that the population base for the reapportionment would be the 1990 census data. The Board decided that it would not adjust the census data to account for NRMP.

In its Report and Proposed Plan, the Board discussed several methods for determining the appropriate adjustment to be made. The Board discussed the method used by the 1973 Board whereby the number of Alaska residents on a military base was determined by multiplying the number of registered voters on the base by the statewide person-counted/registered-voter ratio. The number of "residents" obtained was then divided by the number of adults living on the base to derive a percentage of residents. When the same method was applied to the 1990 data, all the military bases showed a greater than one hundred percent resident percentage.

The Board explained that other available survey methods were not adequate. It indicated that it had received expert advice that the survey method used in the Department of Labor study made that study inadequate to serve as a basis for making an adjustment. The Board also stated that it had solicited surveys from two political pollsters in Alaska and had been rejected.[34] The Board explained that "a poll taken a significant period of time after the Census enumeration 'would be a sampling of a different set of people with possibly changed attitudes.'" (quoting *Egan*, 502 P.2d at 887). Finally, the Board eliminated Permanent Fund Dividend applications, Military Leave and Earning statements, and registered voter data bases as reliable sources of information about residency.[35]

The Board attempted to discover what other alternatives existed. As noted, the Board received expert opinion that an accurate survey was methodologically impossible. Even when the Board was told that a statewide survey was possible, it was told that identifying the NRMP in each district would be impossible.[36] The Board discussed the expert opinion at its March 4 meeting and agreed with the proposal of director Babcock that, at least as an initial guideline, the survey could not be performed. Additionally the Board determined that the inclusion of NRMP would not result in a rural/urban bias. The Board thus concluded that its original guideline of using the census data as its population base was proper.

■■■ Based on what we have previously required of reapportionment boards, we conclude that the Board's "look" was "hard" enough. It is not necessary to attempt a survey or statistical analysis when a thorough examination reveals that such a survey is not possible. *Groh*, 526 P.2d at 868–69. Rather, we need only be assured that the Governor's authority was "exercised in a rational as opposed to an arbitrary manner." *Id.* at 868. Although we have found a "thorough and exemplary exploration" to be persuasive in proving that the Board's decision was rational, we have not required it. *Groh*, 526 P.2d at 868. The Board's consideration of alternatives and expert advise was sufficient examination.

## V. PROCEDURAL DEFECTS (OPEN MEETINGS AND PUBLIC RECORD ACTS)

Judge Weeks concluded that the Board

---

**34.** The evidence of these solicitations are personal phone conversations between Babcock and the solicited pollsters. There is no indication as to the reason the pollsters declined to conduct the survey.

**35.** These were the only alternatives considered at the March 4, 1991 meeting at which the initial "guidelines" were adopted. At this meeting the Board was presented with and accepted the ar-

gument that the census was the only feasible population base.

**36.** The Board also claims that the effect of inclusion was minimal due to the very low NRMP population. However, the Board did not produce any significant data supporting this assertion.

violated the Open Meetings Act [37] and the Public Records Act [38] as it formulated its reapportionment plan. However, he also determined that "[b]ecause of the other decisions in this case, the public interest is better served by not voiding the plan on the basis of Open Meetings Act violations." He did not grant relief on the basis of the Open Meetings Act or the Public Records Act.

 We agree with Judge Weeks that these Acts generally apply to the activities of the Reapportionment Board. However, since he did not grant relief on the basis of either Act, we decline to determine the extent of their application to specific activities. Similarly, we decline to determine whether an independent constitutional basis exists for ensuring public access to the Board's meetings. Accordingly, we affirm only the trial court's determination that the Open Meetings Act and Public Records Act apply generally to the activities of the Reapportionment Board.

## VI. CONCLUSION

We AFFIRM the superior court's conclusion that the plan's formulation of Districts 1, 2 and 3 violates article VI, section 6 of the Alaska Constitution, because the districts are not "socio-economically integrated and they easily could have been." We also AFFIRM its conclusion that the configuration which divides the Mat–Su Borough among five districts (designated 6, 26, 27, 28 and 34) is invalid, since it unfairly dilutes the proportional representation guaranteed to the Mat–Su Borough's residents. Further, we AFFIRM its conclusion that District 35, which joins the North Slope Inupiaq and the Interior Athabaskan areas, violates article VI, section 6 of the Alaska Constitution because it does not encompass a relatively integrated socio-economic area.

We conclude independently that the separation of the Aleutian Islands into two districts violates the contiguous territory requirement of article VI, section 6 of the Alaska Constitution.

We AFFIRM the superior court's conclusion that the Open Meetings Act and Public Records Act apply to the Board. We decline to address its conclusion that the public interest would not be served by voiding the plan on the basis of Open Meetings Act violations.

We REVERSE the superior court's conclusion that the Board failed to make a reliable determination regarding the inclusion or exclusion of non-resident military personnel. The Board's consideration of various alternatives and expert advice was a sufficient "hard look" at this issue.

The case has been remanded to the superior court with directions to remand the 1991 Proclamation of Reapportionment and Redistricting Plan to the Board for reformulation consistent with our Order of June 8, 1992, and this opinion.

MOORE, Chief Justice, concurring, in part, and dissenting, in part.

To the extent indicated in the attachment to today's opinion marked "APPENDIX C," I continue to dissent. Otherwise, I concur in the action that we have taken in this case, and in the opinion of the court.

BURKE, Justice, concurring, in part, and dissenting, in part.

To the extent indicated in the attachments to today's opinion marked "APPENDIX B" and "APPENDIX C," I continue to dissent. Otherwise, I concur in the action that we have taken in this case, and in the opinion of the court.

### INDEX TO APPENDICES

APPENDIX A: Governor Hickel's 1991 Reapportionment Plan (Final Plan)

APPENDIX B: Order, May 28, 1992, Alaska Supreme Court

APPENDIX C: Corrected Order of Remand, June 8, 1992, Alaska Supreme Court

---

**37.** AS 44.62.310–.312.

**38.** AS 09.25.110–.140.

**58**

APPENDIX D: Order, June 11, 1992, Alaska Supreme Court

APPENDIX E: Memorandum and Order, June 18, 1992, Superior Court Judge Larry Weeks

APPENDIX F: Memorandum and Order, June 19, 1992, Superior Court Judge Larry Weeks

APPENDIX G: Order, June 25, 1992, Alaska Supreme Court

APPENDIX H: 1992 Interim Reapportionment Plan, June 25, 1992

APPENDIX A

Governor Walter J. Hickel's 1991 Reapportionment Plan Final Plan

State of Alaska

Southeast
Final Plan

Houston – Wasilla – Palmer Area

Final Plan

APPENDIX B

## THE SUPREME COURT OF THE STATE OF ALASKA

### ORDER

[Filed May 28, 1992]

Before: RABINOWITZ, Chief Justice, BURKE, MATTHEWS, COMPTON and MOORE, Justices.

This matter having come before the court upon a petition and cross-petition for review, and the court having heard oral argument, and being advised in the premises:

IT IS HEREBY ORDERED:

1. The Reapportionment Plan contained in the Governor of Alaska's Proclamation of Reapportionment and Redistricting of September 5, 1991, is held unconstitutional in the following respects:

a) *House Districts 1, 2 and 3.* The superior court's relevant findings of fact and conclusions of law as to House Districts 1, 2 and 3 are AFFIRMED. These districts, as constituted, are violative of article VI, section 6 of the Alaska Constitution. The districts do not contain, as nearly as practicable, relatively integrated socio-economic areas, identified with due consideration given to existing local government boundaries. Further, District 3, as constituted, violates the contiguous and compact territory requirements of article VI, section 6 of the Alaska Constitution.

b) *House Districts 6, 26, 28 and 34.* The superior court's relevant findings of fact and conclusions of law as to House Districts 6, 26, 28 and 34 are AFFIRMED. These districts, as constituted, are violative of article VI, section 6 of the Alaska Constitution. The districts do not contain, as nearly as practicable, relatively integrated socio-economic areas, identified with due consideration given to existing local government boundaries. Further, District 28, as constituted, violates the contiguous and compact territory requirements of article VI, section 6 of the Alaska Constitution.

c) *House District 35.* The superior court's relevant findings of fact and conclu-sions of law as to House District 35 are AFFIRMED. House District 35, as constituted, is violative of article VI, section 6 of the Alaska Constitution. It does not encompass, as nearly as practicable, a relatively integrated socio-economic area.

d) *Western Aleutians.* We deem it plain error under the contiguous territory requirement of article VI, section 6 of the Alaska Constitution not to include the Western Aleutians with the Eastern Aleutians in one district. Thus unless the severance of the Western Aleutians from the Eastern Aleutians is mandated by federal law, the areas must be joined in one district.

2. *Inclusion of Non-resident Military in Population Base.* The superior court's holding that it was arbitrary on the part of the Governor's Advisory Reapportionment Board (Board) not to exclude non-resident military from the population base is REVERSED. Review of the record demonstrates that the Board had a reasonable basis for its decision not to exclude non-resident military from its determination of the relevant population base.

3. *Applicability of the Open Meetings Act and the Public Records Act to the Proceedings of the Advisory Reapportionment Board.* The superior court's holdings that the Open Meetings Act, AS 44.-62.310–.312, and the Public Records Act, AS 09.25.110–.140, apply to the Board are AFFIRMED.

4. A separate order of remand will follow.

5. An opinion will follow addressing the issues raised in the petition and cross-petition for review.

Entered by direction of the Supreme Court at Anchorage, Alaska, on May 28, 1992.

Clerk of the Supreme Court
/s/ Jan Hansen
Jan Hansen

BURKE, Justice, dissents in part.

Justice BURKE disagrees with the court's conclusion that Districts 28 and 35, as constituted, violate article VI, section 6.

## APPENDIX C

# THE SUPREME COURT OF THE STATE OF ALASKA

## CORRECTED ORDER OF REMAND

[Filed June 8, 1992]

In our order of May 28, 1992, this court ruled on the merits of the petition and cross-petition filed herein. The trial court's order of May 11, 1992, which invalidated the reapportionment and redistricting plan of September 5, 1991, was affirmed in part and reversed in part. In accordance with that order, this case is now remanded to the superior court with the following directions:

## A: FORMULATION OF A FINAL PLAN

The superior court shall remand the case to the reapportionment board with instructions to formulate a final plan of reapportionment and redistricting which complies with the mandates contained in the superior court's order of May 11, 1992, as modified by the order of this court dated May 28, 1992.

## B: FORMULATION OF AN INTERIM PLAN

1. An interim plan of reapportionment and redistricting plan is necessary so that the 1992 elections may be conducted in compliance with the equal protection clause of the Federal Constitution, the federal voting rights act, and article VI, section 6 of the Alaska Constitution.

2. On remand, the superior court shall formulate an interim plan. The plan shall be consistent with the superior court's order of May 11, 1992, as modified by the order of this court of May 28, 1992. The plan shall comply with the equal protection clause of the Federal Constitution, the federal voting rights act, and the requirements of article VI, section 6 of the Alaska Constitution, but need not comply with the guidelines adopted by the reapportionment board. Priority must be given first to the Federal Constitution, second to the federal voting rights act, and third to the require-ments of article VI, section 6 of the Alaska Constitution. The requirements of article VI, section 6 shall receive priority *inter se* in the following order: (1) contiguousness and compactness, (2) relative socioeconomic integration, (3) consideration of local government boundaries, (4) use of drainage and other geographic features in describing boundaries.

3. The superior court is authorized to employ an expert or experts under Evidence Rule 706, or to appoint a master or masters under Civil Rule 53 to assist it in formulating an interim plan.

4. In formulating an interim plan, the court may change any district, in addition to those specifically found to be in violation of the Alaska Constitution under the superior court's order of May 11, 1992, as modified by the order of this court of May 28, 1992, if necessary to meet the requirements of the Federal Constitution, the federal voting rights act, or the state constitution.

5. Procedures and schedules regarding the submission of proposed interim plans by the parties and objections to the interim plan formulated by the superior court shall be established by order of the superior court. The superior court shall issue its final order formulating an interim plan on or before June 18, 1992.

6. The superior court is authorized to extend filing and related deadlines for the August 1992 primary elections.

7. Unless otherwise ordered by this court, the lieutenant governor is to conduct the 1992 primary and general elections pursuant to the interim reapportionment and redistricting plan adopted by the superior court.

8. The interim plan adopted by the superior court shall be subject to discretionary review by this court under Appellate Rule 402 on an expedited basis.

SO ORDERED:

Entered by direction of the court at Anchorage, Alaska this 8th day of June, 1992. BURKE, Justice, joined by MOORE, Justice, dissenting in part.

Clerk of the Supreme Court
/s/ Jan Hansen
Jan Hansen

BURKE, Justice, with whom MOORE, Justice, joins, dissenting in part.

Legislative reapportionment responsibility is given by the Alaska's constitution to the state's governor. Alaska Const. art. VI, § 3; *Wade v. Nolan*, 414 P.2d 689 (Alaska 1966). When properly challenged, however, a reapportionment plan proclaimed by the governor is subject to judicial scrutiny. Alaska Const. art. IV, § 11. When the challenge is successful, as is the case here, the state constitution allows "the superior court to compel the governor, by mandamus or otherwise, to perform his reapportionment duties or to correct any error in redistricting or reapportionment." *Id.* I am not convinced, however, that the constitution allows us to direct the superior court to seize the executive's reins, and develop a reapportionment plan of its own, even on an interim basis, unless and until it becomes clear that the governor is either unwilling or unable to develop a proper plan within the time that is available.

I, therefore, dissent from that part of today's order of remand directing the superior court to develop an interim reapportionment plan. I view the decision by this court to issue the order, in its present form, as an abuse of our judicial power. If an interim plan is needed, which is clearly the case, the governor should be directed to prepare it, within a specified period of time; the superior court should be authorized to devise an interim plan only in the event that the governor fails to act within the time allowed.

I am authorized to state that Justice MOORE joins in my dissent.

## APPENDIX D

### IN THE SUPREME COURT OF THE STATE OF ALASKA

### ORDER

[Filed June 11, 1992]

Before: RABINOWITZ, Chief Justice, BURKE, MATTHEWS, and MOORE,

1. The supreme court affirmed this court's rele-

Justices. [COMPTON, Justice, not participating.]

On consideration of the petition for review, filed on June 8, 1992, and the response to the petition, filed on June 10, 1992,

IT IS ORDERED:

1. The petition is GRANTED.

2. In the superior court's instructions to the special masters, there is no legal basis for the requirement that, wherever possible, native influence districts be drawn to include at least 35 percent native population. Action that is not *required* by the Voting Rights Act, which detracts from adherence to the requirements of the Alaska Constitution, is not allowed. The 35 percent requirement, is therefore, disapproved.

Entered by direction of the court at Anchorage, Alaska on June 11, 1992.

Clerk of the Supreme Court
/s/ Jan Hansen
Jan Hansen

## APPENDIX E

### IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

### FIRST JUDICIAL DISTRICT AT JUNEAU

[Filed June 18, 1992]

Case No. 1JU–91–1608 Civil (Consolidated)

### MEMORANDUM AND ORDER

*Procedural History*

On May 11, 1992, after extensive briefing and a 16–day trial, this court held unconstitutional parts of Governor Hickel's September 5, 1991 reapportionment plan. A petition for review was taken to the Alaska Supreme Court on an expedited basis and on May 28 the supreme court entered two orders in the case. The first order affirmed in part and reversed in part the decision of the superior court on the merits.[1] The second order remanded the case

vant findings of fact and conclusions of law as

to this court with directions to devise an interim redistricting plan for use this year.[2] This court was directed to devise the interim plan by June 18, 1992.

After soliciting suggestions from the parties on how to proceed,[3] the court appointed three Special Masters to devise a redistricting plan. The masters were chosen from nominations by the parties. One was suggested by the governor (Harold Gillam); one was suggested by the plaintiffs (Brian Rogers); and one was picked by the court with the agreement of the parties (Wilson Condon). The masters were sworn on June 3rd and Mr. Condon was appointed chair.[4]

The masters were given various written instructions after briefing from the parties and in response to the masters' questions.[5]

The parties filed draft plans on June 8 and made presentations to the masters.

The masters were instructed to return a draft plan to the court on Saturday June 13; this deadline was extended to noon, Sunday, June 14, 1992, when the masters presented their recommended plan to the court.[6] The parties and the public had until the close of business June 16 to make written objection to the masters' recommended plan.[7]

Meanwhile, the court entered an order on June 5, 1992, postponing the primary election from August 25 to September 8; other election deadlines were also postponed in accordance with the supreme court Order of Remand which authorized this court to "extend filing and related deadlines for the August 1992 primary elections." [8]

These changes in election law as well as the court's proposed interim plan must be precleared by the U.S. Department of Justice. This court has ordered the State to submit these to the department and ask for

to House Districts 1, 2, 3, 6, 26, 28, 34, and 35. The supreme court affirmed this court's holding that the Open Meetings Act and the Public Records Act apply to the Governor's Advisory Reapportionment Board. The court reversed this court's holding that it was arbitrary on the part of the Board not to exclude non-resident military from the population base. Justice Burke dissented in part, disagreeing with the court's conclusion that House Districts 28 and 35 violated Article VI, Section 6 of the Alaska Constitution.

2. For the *final* plan, the supreme court directed this court to "remand the case to the reapportionment board *with instructions to formulate a final plan of reapportionment and redistricting which complies with the mandates contained in the superior court's order of May 11, 1992, as modified by the order of this court dated May 28, 1992."* Order of Remand May 28, 1992, at p. 1. Justice Burke, with whom Justice Moore joined, dissented from that part of the remand which required the superior court to formulate an interim plan, stating:

If an interim plan is needed, which is clearly the case, the governor should be directed to prepare it, within a specified period of time; the superior court should be authorized to devise an interim plan only in the event that the governor fails to act within the time allowed.

Order of Remand at p. 4 (Burke, J., dissenting).

3. *See* Memorandum and Order entered May 29, 1992. The May 29 order also extended to June 26, 1992 the deadline for candidates filing for legislative office. Soon after this order was

entered, confusion arose regarding that deadline. The issue was whether or not the deadline had been extended for congressional candidates as well as for state legislative candidates. This confusion was resolved when this court entered an order June 8 making it clear that the deadline extension included congressional candidates. The two deadlines are normally the same; they are set in the same statute (AS 15.25.040(a)(1)). At this time the court knows of no Petition for Review filed in this matter.

4. *See* Memorandum and Order of June 3, 1992.

5. This court ordered that communications with the Masters be in writing filed with the court, or in open court. The written communications with the filing dates are as follows. Instructions to Masters (June 3); First Set of Questions from Masters (June 3); Second Set of Questions from Masters (June 4); Third Set of Questions from the Masters (June 5); Amended Instructions to Masters (June 5); Fourth Set of Questions from Masters (June 8); Request to the Court From the Special Masters (June 9); Further Instructions to Masters (June 9); Amended Further Instructions to Masters (June 9); Fifth Set of Questions from Masters (June 11); Sixth Set of Questions from Masters (June 11); Additional Instructions to Masters (June 11).

6. The Masters' written report was filed June 14, 1992.

7. *See* Order of June 9.

8. Order of Remand at p. 3.

expedited review.[9] The State has done so with respect to the change in election dates and filing deadlines.[10] The State asked this court to postpone some 24 Rural Education Attendance Area (REAA) and Coastal Resource Service Area (CRSA) elections until the Spring of 1993. In part because some of the REAA's objected to the delay, this motion was denied in an Order entered June 10.

## Introduction

The plan being promulgated by this order is an interim plan. It is in effect only until a final plan is promulgated by the reapportionment board in accordance with the supreme court's order.

A court creating an interim plan has less discretion than does a governor creating a long-term plan.[11] Although Article VI, Section 6 of the Alaska Constitution does not restrict the creation of senate districts by the governor, the Alaska Supreme Court has said that a court is more restricted in creating senate seats for *interim* plans than the governor is in creating permanent plans.[12]

This decision will address the court's role in reapportionment, Department of Justice preclearance under the Voting Rights Act, how the court interacted with the masters

in this case, the masters' plan and specific queries posed by the masters, objections raised by the public and parties, and the court's analysis of the plan and the court's changes to it.

## Court Involvement in Reapportionment

The State, and to some extent the masters, have questioned the extent of court involvement in reapportionment and particularly court participation in preparing an interim plan. As explained in this court's opinion of May 11, 1992, it is clear that the authors of the Alaska Constitution planned that the superior court *and* the supreme court would review the reapportionment process.[13] The chair of the convention's reapportionment committee said during the constitutional convention that the reapportionment article in the constitution would

> set up very, very careful standards and limiting factors so that the Governor and the Board will not run away and will be acting within limits—within clear limits—and are not given wide discretion.

3 Proceedings, Constitutional Convention, at p. 1839.

Article VI, Section 11 of the Alaska Constitution provides:

> Any qualified voter may apply to the superior court to compel the governor,

9. Memorandum and Order entered June 3 at p. 1.

10. *See* Submission Under Section 5 of the Voting Rights Act filed with this court June 15.

11. Two Alaska Supreme Court opinions apply. The 1972 reapportionment lawsuit resulted in an interim plan prepared by masters appointed by the court. The Supreme Court in that case gave the masters the following instruction:

> In establishing House and Senate districts you should, whenever feasible, create a district of contiguous and compact territory containing as nearly as practicable a relatively integrated socio-economic area.

*Egan v. Hammond,* 502 P.2d 856, 877 (Alaska 1972).

Plaintiffs and the State have stipulated that the 1972 masters report would be considered as evidence in this 1992 case. (Ex. S–82).

In the 1987 decision dealing with reapportionment the Alaska Supreme Court held that the Alaska constitutional requirements from Article

VI, Section 6 did not apply to *senate* districts but:

> This instruction [above] indicates that, at least in the case of a court-ordered interim reapportionment plan, Article VI, § 6 requirements apply to Senate districts. However, this standard does not necessarily circumscribe the governor's power to effect a reapportionment of the senate because of the greater discretion he exercises in carrying out his duties.

*Kenai Peninsula Borough v. State,* 743 P.2d 1352, 1364 n. 19 (Alaska 1987).

12. Even the governor's flexibility with respect to senate districts is not unlimited. "Senate districts which meander and ignore political subdivision boundaries and communities of interest will be suspect under the Alaska Equal Protection clause" *Kenai Peninsula Borough v. State,* 743 P.2d 1352, 1365 n. 21 (Alaska 1987).

13. The superior court hears the case but the supreme court reviews *de novo* the proceedings. Article VI, Section 11. *Groh v. Egan,* 526 P.2d 863 (Alaska 1974)

by mandamus or otherwise, to perform his reapportionment duties *or to correct any error in redistricting or reapportionment.* (emphasis added)

Judicial review of government action necessarily involves courts making decisions about executive or legislative acts. *Marbury v. Madison,* 5 U.S. 137 [2 L.Ed. 60] (1803). In many other states, state courts have drafted legislative reapportionment plans. *See, e.g., Wilson v. Eu,* [Cal.4th 707, 4 Cal.Rptr.2d 379] 823 P.2d 545 (Cal. 1992) (special masters draw up 1992 California legislative reapportionment plan); *Hellar v. Cenarrusa,* [106 Idaho 586] 682 P.2d 539 (Idaho 1984) (state court-ordered plan for 1984 Idaho legislative reapportionment); *Kallenberger v. Buchanan,* 649 P.2d 314 (Colo.1982) (state court-ordered reapportionment plan for 1982 Colorado legislature). Many federal courts have rewritten plans to meet the requirements of the Voting Rights Act. *See, e.g., Connor v. Johnson,* 402 U.S. 690 [91 S.Ct. 1760, 29 L.Ed.2d 268] (1971); *Upham v. Seamon,* 456 U.S. 37[, 102 S.Ct. 1518, 71 L.Ed.2d 725] (1982). Federal courts run school districts. *Freeman v. Pitts,* [——] U.S. [——], [112 S.Ct. 1430] 118 L.Ed.2d 108 (1992). In over 40 states, including Alaska, state corrections systems are run by court order. *Cleary v. State,* 3AN81–5274CI. Courts regularly amend or void fish and game regulations and season and bag limits. *See, e.g., State v. Kluti Kaah Native Village,* [831] P.2d [1270,] Op. No. 3339 (Alaska, May 8, 1992). Courts make detailed changes in utilities regulations and tariffs and a variety of other executive branch matters. *APUC v. Municipality of Anchorage,* 555 P.2d 552 (Alaska 1976).

Whether or not the above is always good public policy, there is no doubt that it is within the legal power of the court to remedy unconstitutional and illegal situations by framing short-term solutions.

Court involvement in an interim reapportionment plan is less intrusive and more naturally a part of the judicial process than court involvement in such areas as running corrections systems. Courts writing an interim reapportionment plan have no day-to-day supervision or control over an on-going process. There is but one decision to make and making that one-time decision is what courts are best able to do.

A glance at Alaska history shows precedent for this approach. In 1972, an Alaska court appointed masters who produced an interim plan. The masters were appointed by the court from the opposing viewpoints of the parties in the case. Whether or not masters have produced other interim plans in Alaska is not a part of this record.

While the court in this 1992 case did not originally postpone elections, extend deadlines, appoint masters or become involved in the preparation of any interim plan, there is no doubt that it has the legal power to do so. *Egan v. Hammond,* 502 P.2d 856 (Alaska 1972); Order of Remand, May 28, 1992.

*Department of Justice Preclearance*

Section 5 of the federal Voting Rights Acts requires the State of Alaska to submit any changes in election law or procedure to the U.S. Department of Justice for a determination that the changes do not discriminate against minorities.

That Department of Justice review is sometimes long and thorough [14] and it is sometimes governed by informal practices of the Department of Justice, as well as by explicit requirements of the statute. (Cooper Memorandum to Board Ex. A, p. 3915–3944).

This court is very concerned that approval of the interim plan will not proceed quickly enough to allow our state to have an orderly and timely primary. In attempting to meet what was said to be one of the

14. The original proclamation by the governor in this case was made on the 5th of September, 1991. The state submitted the reapportionment plan to the Department of Justice on the 1st of November, 1991. The Department of Justice requested additional information on the 31st of December, 1991. The State provided the requested information in February of 1992. It was not until the 10th of April, 1992, that the department notified the State that it would make no objection to the plan.

informal concerns of the Department of Justice, this court gave the masters an instruction that encouraged the creation of Native "influence" districts, districts in which Alaska Natives would comprise 35 percent of the population. This proportion was chosen because expert study in Alaska suggests that Native influence districts of 35 percent are *de facto* Native control districts.[15] The instruction to the masters said, "Wherever possible, those [Native] influence districts should be drawn with the goal of creating a district with a Native population of 35 percent." This instruction was intended to help obtain speedy preclearance from the Department of Justice under Section 5 of the Voting Rights Act. The State asked the supreme court to review this instruction and the supreme court granted the petition, holding:

> ... there is no legal basis for the requirement that, wherever possible, native influence districts be drawn to include at least 35 percent native population. Action that is not *required* by the Voting Rights Act, which detracts from adherence to the requirements of the Alaska Constitution, is not allowed. The 35 per-

cent requirement is therefore, disapproved.

Order of June 11, 1992 (emphasis in original).

The masters were given a copy of the supreme court's order and told that this court's previous instruction on that issue was deleted. Several other instructions [16] that had been submitted by the State and plaintiffs explaining the role of preclearance and some of the Department of Justice's informal considerations in the preclearance process remained with the masters by stipulation of the parties.

The court encourages those counsel and their clients who believe that they can live with this interim plan to lend their support to the State in its application to the Department of Justice for timely preclearance. An orderly election is important to the state and to all the parties to the litigation.

### Priorities of an Interim Plan

This court gave the masters instructions that reflected the constraints of creating an interim plan. In those instructions, the U.S. Constitution ranked highest, followed by the federal Voting Rights Act, the Alas-

---

15. Grofman's report (Ex. A. p. 7096–7099).

16. These other instructions were given on June 9 and included:

Minority "influence" districts and treatment of minority incumbents are part of the "totality of the circumstances" which the Justice Department will examine to determine whether a reapportionment plan will be precleared under section 5 of the Voting Rights Act. Accordingly, the instructions you are provided regarding influence districts and minority incumbents cannot be precise. With this in mind, the following answers to your questions are provided.

Under Section 5 of the Voting Rights Act, the United States Department of Justice will evaluate the totality of the circumstance when presented with a plan which has retrogression in an existing Native influence district, to determine whether the plan has a discriminatory purpose or effect. Creation of an alternative Native influence district will be viewed favorably as an indication that the plan does not have a discriminatory intent and effect. Only Alaska Natives are sufficiently numerous and geographically compact to be able to form a district in which they comprise a majority, or even a significant influence group. Taken separately, the Black, Hispanic and Asian populations in

Anchorage and Fairbanks are not sufficiently large to be a factor under the Voting Rights Act.

The Voting Rights Act protects voters, not incumbents. However, in evaluating a reapportionment plan for preclearance, the Justice Department might view the treatment of minority incumbents as part of the totality of the circumstances. For example, the Department of Justice might view as suspect a pattern of pairing minority incumbents in districts with other incumbents. Accordingly, you may consider treatment of minority incumbents, although you should not prioritize this above other considerations.

Preclearance under Section 5 of the Voting Rights Act will be denied if, under the totality of the circumstances, the United States Department of Justice cannot determine whether a proposed plan has a discriminatory intent or would have a discriminatory effect. Preclearance will almost certainly be denied if a plan results in avoidable retrogression of the number of Native majority districts ...

In Alaska any reduction to the number of Native majority or Native influence districts cannot be justified by a corresponding increase in Black or Hispanic influence districts. You should only evaluate plans for the number of *Native* majority and influence districts created.

ka Constitution, procedural requirements and finally practical tips to aid the Division of Elections in preparing for re-districting.[17]

Following is a summary of the specific constraints given to the masters.

Total deviation among districts was not to exceed 16.4 percent. Total deviation was not to exceed 10 percent unless mandated by some legal requirement, applied consistently across the state. The masters had the requirements of the Alaska constitution to: (1) maintain contiguity and com-

pactness, (2) maintain relative socio-economic integration, (3) consider local government boundaries, (4) use drainage and other geographic features in describing boundaries. The masters were not to exclude non-resident military. They were to keep Adak in the Aleutians if that could possibly be done and comply with the Voting Rights Act. They were to maintain four house and two senate districts in which Alaska Natives comprise a majority of the population, and two house and two senate Native "influence" districts. They were to avoid placing former District 17 non-Native vot-

17. Those instructions are contained in the order dated June 5, 1992 and provide in part:

You are to the best of your ability to draft a plan which is consistent with the superior court's order as modified. It is not your job to reconsider the lawsuit; the lawsuit has been decided. It is your job to draw up a plan consistent with the result. You are to disregard anything inconsistent with that direct order of the Supreme Court of the State of Alaska.

We have prepared a package of materials to aid you, and there will be additional materials prepared in the near future. The package includes these instructions, the relevant orders of this court and the supreme court, sections from the Code of Judicial Conduct, and other materials. This package will be made available to the public at Legislative Information Offices throughout the state.

You may have access to any part of the court record on request. Please keep a list of materials you consider.

You are to operate by majority rule. If a minority report is necessary, it may be prepared. Wilson Condon is appointed Chair.

The following restrictions apply to the plan you create:

1. Total deviation is not to exceed 16.4 percent.

2. Total deviation is not to exceed 10 percent unless required by constitutional considerations of compactness and contiguity or by efforts to conform district lines to local government boundaries or to create districts which as nearly as practicable contain relatively integrated socio-economic areas or to follow drainage or other geographic features, or to comply with the federal Voting Rights Act. Any such justification for deviations above 10 percent must be applied consistently by the masters in creating new districts.

3. There is to be no exclusion of nonresident military personnel or their dependents from the population base.

4. You are to strive to maintain four house and two senate districts in which Alaska Natives comprise a majority of the population, and two house and two senate Native "influence" districts. Wherever possible those influence dis-

tricts should be drawn with the goal of creating a district with a Native population of 35 percent.

5. You may create multi-member districts, except in that part of the state now included in House District 17 (under the 1984 reapportionment plan).

6. The requirements of Article VI, Section 6 shall receive priority *inter se* in the following order: (1) contiguity and compactness, (2) relative socio-economic integration, (3) consideration of local government boundaries, (4) use of drainage and other geographic features in describing boundaries.

7. In formulating an interim plan, you may change any district in addition to those specifically found to be in violation of the Alaska Constitution under the superior court's order of May 11, 1992, as modified by the order of the supreme court of May 28, 1992, if necessary to meet the requirements of the Federal Constitution, the federal Voting Rights Act, or the state constitution.

8. If all the other instructions of the court can be complied with, and there is a choice of whether to use an intact Voting Tabulation District (VTD), or fracturing a VTD, it is preferable to use an intact VTD.

The following are guidelines for your work:

1. You are to have no contact with the parties except in open court or in writings filed with the court.

2. You may devise your own work schedule. The court asks you to read the materials presented to you as soon as possible, and you must be prepared to be at work in Juneau on Monday, June 8, 1992.

3. If you have any questions for the parties or the court, please submit them in writing; the parties will respond within 24 hours, and the court will respond as soon as possible.

4. When working for the Special Masters, the computer operators may accept direction only from the Special Masters. The computer operators may not disclose to the Special Masters any information concerning redistricting that they have acquired from parties. The computer operators may have no contact with the parties concerning their work for the Special Masters except through the Special Masters.

ers in an election district that was minority influence if the non-Natives might be able to overwhelm Native citizens by polarized voting and they were to attempt to avoid pitting incumbent Native legislators against other incumbents. Given all that, if possible they were to avoid breaking up Voting Tabulation Districts (VTD's).[18]

### The Masters' Plan

The masters adopted most of the plaintiff's plan for Southeast Alaska, much of the State's alternative "A" for the eastern and northern part of Alaska and mostly the State's alternative "B" for Western Alaska. The masters accepted the Board's plan for Kenai and Anchorage and were unable to agree on a single plan for Fairbanks, submitting two options for the court to consider.

### Juneau

Juneau, is a highly integrated community with sufficient population to support two house districts.[19] The city's economy is dominated by state, city, and federal government employment; it is dramatically different from the economy of cities anywhere else in Southeast Alaska or in any other region of the state. Juneau residents share few legislative interests with other residents of Southeast Alaska, especially residents of the small rural communities that make up the bulk of House District 3.[20]

Under every redistricting plan before this one, Juneau has been included in a two-member (multi-member) house district.[21] In the 1984 redistricting plan, the two Juneau house districts were paired to form a single senate seat that contained all of Juneau. Governor Hickel's plan divides Juneau into two single-member house districts (Districts 4 and 5).

Multi-member election districts have been used in some places in this country to dilute the voting rights of minority groups and are often therefore suspect.[22] Good government groups now support the use of single-member districts, and people in Alaska testified during trial and before the Board in favor of single-member districts generally. This court, however, believes that there are places where multi-member districts are preferable and are used, not to dilute any segment's voting strength, but to unify a community. Alaska public officials so testified in this case and before the Board. (Ulmer; Juneau's mayor Ex. A, p. 2232–2237; Kohler) The masters strongly agreed that a multi-member district was best for Juneau. (Report p. 32–34)

There is no evidence that Juneau's multi-member house district has ever in any way resulted in minimizing or canceling the voting strength of any racial or political group. The federal Voting Rights Act does not force the State to separate Juneau into two single-member house districts. Under that act, the only area in Alaska that could not be placed in a multi-member district would be former District 17, the only place in Alaska where racially polarized voting has been documented in the record.

The plaintiffs recommended a multi-member district for Juneau and this court believes this would be the best thing for that community. Juneau has always been in a multi-member district. There is no meaningful evidence or testimony before the court that discourages a multi-member district for Juneau. Rather, the court has heard the opposite.

---

**18.** VTD's are a close approximation of precincts.

**19.** See citations to record on pages 68 and 69 of this court's May 11, 1992 opinion.

**20.** The court adopts the numbering system used by the special masters. See attachment for a list.

**21.** Single-member districts have populations of 13,751 or thereabouts and elect one representative. Multi-member districts are districts comprised of double or triple the population of a single member district, with two or three representatives elected, usually at-large.

**22.** However, multi-member districts are of concern only when there is polarized voting. *Thornburg v. Gingles,* 478 U.S. 30, 51, 106 S.Ct. 2752, 2766–67, 92 L.Ed.2d 25 (1986). In Alaska, the cost of campaigning in many districts is the same whether the districts are single- or multi-member. (Ulmer, Vol. VI, p. 157)

The masters declined to put Juneau in a multi-member district because it was not required by the U.S. Constitution, the federal Voting Rights Act or the state constitution.

An argument can be made that putting Juneau in a multi-member district maximizes socio-economic integration. This court found that the Alaska constitution requires maximizing socio-economic integration, and the supreme court agreed. However, this court interprets that requirement to pertain *within* districts, not *between* two districts.

The failure by the State and the masters to put Juneau in a multi-member district elevates form over substance. Sometimes, though, form is important. In this case, "form" is the law. The law, as stated by the Supreme Court for this case, is that districts should not be joined unless that modification is required by the U.S. Constitution, the Voting Rights Act or the Alaska Constitution. Such a change is not required in this case and this court is bound by that limitation, whether it is in the best interests of Juneau or not.

The essence of the process is that courts follow the law whether they agree with it or not. For that reason alone, this court accepts the masters' recommendation that Juneau be in two separate single-member house districts.

### · *Southeast Alaska*

The court accepts the masters' plan with respect to Southeast Alaska. The court does so because a similar version of that plan, reported in the press for months is widely supported by the communities and interest groups in Southeast Alaska, especially by Alaska Natives, and because the plan meets the requirements of federal and state law. No one at trial suggested any alternative plan for Southeast, other than board members.

### *Military Bases in Alaska*

The governor's reapportionment board did not exclude non-resident military in

Alaska. The Alaska Supreme Court said that the Board had a reasonable basis for its decision. May 28 Order at 3. Including non-resident military personnel in the population base (people who, because they claim residency elsewhere, may have little interest in Alaska affairs) creates odd situations, with legislators representing large populations on paper but relatively few actual voters. This court addresses the most extreme of these situations when it discusses Adak below. The decision not to exclude non-resident military, coupled with Alaska's large, undivided military precincts, could perhaps be profitably addressed by the legislature.

### *Adak*

The Adak Naval Air Station is a military outpost on the Aleutian Chain. Over 5,300 people live on the island, but fewer than 2,000 are registered to vote. Tours of duty are short on Adak and few of those who live there are involved in Alaska affairs. Voter turnout is abysmal—fewer than 400 voters actually go to the polls in a typical election.[23] Most commerce is directly from Anchorage by non-stop flight and much of that is military. Adak (and the smaller military outposts on the nearby islands of Shemya and Attu) are U.S. Government reservations with limited access. Airplanes cannot land without prior permission. Because federal law prohibits government employees from standing for state or national office, only a dependent of a military or civilian employee could run for state office from the three bases.

Adak, Shemya and Attu have little or no socio-economic integration with any place else on the Aleutians. In many ways residents of these islands have more in common with military personnel on Elmendorf Air Force Base or Ft. Richardson near Anchorage or even with those at Eielson Air Force Base or Ft. Wainwright near Fairbanks than they do with residents of the Aleutian Islands and the Alaska Peninsula.[24] However, Article VI Section 6 of the

---

**23.** Ex. A. p. 2526.

**24.** The commander of Adak wrote the court a letter during the public comment period for the

Alaska Constitution, in setting out requirements for redistricting, ranks compactness and contiguity higher than socio-economic integration and there is good reason for this ranking. The fear that politicians would attempt to carve out little pieces of geography and move them around the map for apportionment purposes has caused 34 states to add requirements for compactness and contiguity to their constitutions.[25]

The governor's original reapportionment plan combined the military base at Adak with the Wade–Hampton census area in Western Alaska to provide a Native majority district. The Alaska Supreme Court found this to be clear error, saying that the Aleutians should be kept together unless doing so would violate the requirements of the federal Voting Rights Act. Later, in a response to a petition filed during this case, the state supreme court made it clear that it will require a plan to comply with the expressed terms of the Voting Rights Act but that it will not derogate the Alaska Constitution in order to obtain preclearance of an interim plan with the Department of Justice. Order of June 11, 1992.

The masters keep Adak in the Aleutians. It is *possible* to keep Adak in the Aleutians and keep all of the Aleutians together, as suggested by the supreme court, and still comply with the minimum explicit requirements of the Voting Rights Act—that is, make the district a Native influence district. However, local communities, legislators and the plaintiffs think this is a bad idea because it severely fractures other socio-economic groups.[26] The supreme court's directive to keep Adak with the Aleutian Islands, the constraints set down

in the law and those ordered by this court to ensure compactness and contiguity, force unfortunate and undesirable decisions along all of Western Alaska, Bristol Bay, Prince William Sound, and the South-central part of the state. Those include dividing the Bristol Bay region, splitting the Yupik area, taking Kodiak out of the senate pairing it has held since before Statehood, and other Voting Rights Act decisions. The resulting Adak–Aleutians Native influence district is only barely an influence district and this raises concern that the Department of Justice may not give the speedy preclearance necessary if a plan is to be ready for this election.

Because the Alaska Supreme Court has emphasized the imperative of the Alaska constitutional provisions of compactness and contiguity, this court adopts the masters' plan, with changes noted, which keeps Adak in the Aleutians.

## *Fairbanks*

This court believes that the Fairbanks redistricting problem differs from the problem presented by multi-member districts in Juneau. The unconstitutionality of the governor's original plan required rearrangements in other districts, and these rearrangements forced changes in the Fairbanks districts. (Masters' Report p. 55)

Meanwhile, the masters, unable to agree on a redistricting scheme for Fairbanks, presented masters' alternative plans "A" and "B". The two masters from Fairbanks implicitly agreed that their alternative plan "B" was a better plan for Fairbanks. (p. 23 of the transcript of their presentation;

---

interim plan supporting districting Adak with Elmendorf.

**25.** The court believes that requirements for compactness and contiguity are meant to be read to avoid geographic manipulation of districts for voter dilution or enhancement. By requiring physical limits, those requirements avoid sacrificing groups for the benefit of those doing reapportionment.

Contiguity is widely recognized as an important consideration in redistricting.

If the practice of keeping districts contiguous were seriously eroded, the ability of district drawers to accomplish partisan goals would

be enormously enhanced and, for better or for worse, substantial departures from geographic representation would become possible. A requirement of contiguousness is the most straightforward method of avoiding this problem.

D. Lowensteen and J. Steinberg, *The Quest for Legislative Districting in the Public Interest: Elusive or Illusory?*, 33 U.C.L.A.L.Rev. 1, 21 (1985).

**26.** See letter from Senator Fred Zharoff, pleadings from *amicus* Bristol Bay Native Association, near unanimous testimony before the reapportionment board and other materials in Exhibit A; letters from many community leaders.

p. 57–59 of report) All three masters agreed on and recommended certain changes because of their knowledge of socio-economic relationships with respect to Livengood, Central and Circle Hot Springs.

One master recommended masters' alternative plan "A" because it was similar to a plan brought forward by the governor after the reapportionment board's original plan was ruled unconstitutional, and because this master believes the governor is given the responsibility for reapportionment in Alaska.[27] (Tr. 21–23, Masters' Report p. 56–57 and Appendix P) That master believes the State's plan should receive deference.

After the original plan was ruled unconstitutional, the State presented two separate, widely varied alternative plans to the masters, and there would seem to be a real question which, if either, is to be accorded deference. These State alternative plans were offered during litigation. They were not derived through any particular political process involving public participation or formal structured decision making.

Despite this court's respect for that particular master, this court is unwilling to give any deference to the political process that led to the original reapportionment board decision relating to Fairbanks. That process was the most suspect of all the Board's efforts. The chair of the reapportionment board sent hand drawn scenarios to the executive director and these drawings became the basis for the eventual alternatives. Neither these scenarios nor the correspondence were part of the public record nor was it made known that the communication was occurring. There was little discussion of the Fairbanks alternatives in hearing transcripts. The chair has now announced his candidacy for the legislature from one of those Board-created Fairbanks districts with no incumbent.

Giving deference to that process would be giving deference to violations of the Open Meetings Act, violations of the Public Records Act and violations of constitutional requirements produced by this skewed political process.

The court believes that the state's alternative plans offered during litigation deserve no greater deference in this situation than alternatives offered by any other litigant. If the districts have to be changed, they should be changed to conform to the best possible redistricting in accordance with law. Masters' alternative plan "B" does that best, with exceptions noted.

The masters' Fairbanks plan "B" best meets the socio-economic integration goal of reapportionment. It keeps urban and rural populations together. It helps with speedy clearance of the plan under Section 5 of the Voting Rights Act by the U.S. Department of Justice in two ways. It creates a mixed minority influence district and it avoids placing any portion of the old District 17 (the only Alaska district where voting was polarized in 1990, according to voting expert, Dr. Bernard Grofman) in a Native influence district. The plan "A" District 34 is much like the plan the supreme court found unconstitutional.

This court accepts the masters' plan "B", except as noted.

### Senate Pairings

In creating senate districts, permanent governor-created plans have ignored the requirements for compactness and contiguity, socio-economic integration, observance of local boundaries and geographical features that are mandated in the state constitution for house districts. This court feels bound, however, to observe those restrictions in preparing an interim plan. Again, the priority Alaska constitutional concern is compactness and contiguity. Only the restrictions of the United States Constitution and the Voting Rights Act take priority over that requirement.

The lack of population gain in Southeast Alaska, as compared to the rest of the state between 1980 and 1990, creates a conundrum. Southeast Alaska has five

---

**27.** The court's involvement in reapportionment is addressed in a different section in this opinion.

house districts. Four Southeast house districts can be paired to create two senate seats, but the remaining house district must be paired with a district outside the geographical confines of Southeast Alaska. In one scenario, the Southeast Alaska Islands district could be joined with neighboring Prince William Sound to form a compact and contiguous senate district. That combination, however, dilutes the proportion of Natives in that district to such an extent that a senate Native influence district would be lost. Such a pairing is impermissible and must yield to the federal Voting Rights Act. The masters reviewed an alternative that would join a Prince William Sound district with the Sitka–Wrangell–Petersburg house district, or with a Ketchikan house district. None of the above alternatives is attractive.

This court, believing that the Southeast Alaska Islands district has interests in common with the marine-oriented community of Kodiak, accepts the masters' suggestion and combines these two house districts. Such a pairing maintains Native voting power under the Voting Rights Act.

As discussed above, there is no constitutional requirement in Article VI, Section 6 that senate districts be contiguous. There is an Alaska equal protection guarantee against hodge-podge senate pairings. The supreme court has also restricted masters in what should be attempted in interim plans. *supra.* However, that requirement must yield to the Voting Rights Act when drawing a plan. Given the requirements for keeping Adak in the Aleutians and for passing muster with the Department of Justice under Section 5 of the Voting Rights Act, the court makes that one senate pairing that is not contiguous.

This alignment allows other senate pairings that will help to meet the requirements of the Voting Rights Act. The court pairs Kodiak with the Southeast Islands district, Bethel with the North Slope/NANA district and the Bristol Bay district with the Aleutian district. The Interior Rivers district is joined with the Fairbanks Badger Road district that has no previous non-Native voters from old District 17.

This provides two Senate Native majority districts and two Senate Native influence districts.

To the extent it is possible, the court pairs Fairbanks and Anchorage according to the contiguity and population and surrounding district characteristics. The Prince William Sound district, including Cordova, Valdez and Whittier, is paired with Seward and Soldotna because of the commonality of interests of those communities. Mat–Su pairings are done much as the borough requested for the reasons the borough stated. A list of senate pairings is attached.

It is ordered that all senators must run for office this year. Length of terms shall be two years or four years, depending on the toss of a coin, in a manner and place to be stipulated to by counsel.

### Western Alaska

The masters adopted the State's alternative "B" for Western Alaska. The court believed that "B" unduly disrupted the socio-economic fabric in Bristol Bay and substituted State's alternative "A" instead. Changes then had to be made in State's alternative "A" to establish contiguity, to maximize socio-economic integration, to avoid pitting incumbent minorities one against another, and to equalize population. This was done as the court ran into the same problems the masters had undoubtedly run into. Many people have talked about earthquake zones in reapportionment. Bristol Bay has felt that trembler this year. The requirement to keep Adak in the Aleutians and to comply with the voting rights act requires splitting of groups and traditional district associations in that area.

### Objections of the Parties to the Masters' Plan

The parties have raised the following objections to the redistricting plan drafted by the special masters.

### Interior Plaintiffs

Plaintiffs Demientieff et al. object to the inclusion of Cordova and Prince William

Sound communities into District 35, the exclusion of substantial Ahtna population from District 35, and the exclusion of Nenana from District 35. The basis for their objection to the Prince William Sound combination is the lack of socio-economic integration between the Sound and the Interior Athabascan villages. These plaintiffs believe that the line between District 35 and District 6 fails to place the bulk of the Ahtna Native population in District 35, and suggest that this placement may have been the unintentional result of a technical problem. These plaintiffs argue that Nenana should be placed in District 35 because this placement is required under the court's May 11 decision which held that Nenana is more integrated with the Interior Rivers district than with the Highways district. The reapportionment board had come to the same conclusion. Interior plaintiffs also suggest that Tok should be in District 35.

The court has modified the recommendations of the masters to the extent that Cordova and the Eyak region west of Cordova is included with Valdez and Whittier in District 6 as a part of the Prince William Sound District. This is based on the socio-economic integration of the area, the need for additional population in that district and the unanimous public comment with respect to that area. The Native communities believed themselves more integrated into Prince William Sound than into an interior district. The court sees this area as being dominated by its connection to the sound. This is different from the court change with respect to Tok that is both interior and on the road system.

The court has moved Copper Center, Kenney Lake, Tonsina, parts of Mentasta, Chistochina, Tok, Nenana and areas around Gulkana and Gakona into District 35. ·

This is based on the socio-economic relationships testified to by Ms. Evelyn Beeter of Chistochina, and by the anthropologists, Polly Wheeler and Dr. Steven McNabb. These experts and local people said the Ahtna people are most integrated with the Athabascan villages comprising an important part of District 35. The decision is also based on testimony before the court and the Board, as well as on the Board's decision to include Nenana in this district. Nenana and Tok both include non-Native population once included in former District 17. That non-Native population is unable to dominate an election in a district with a 60 percent Native population. Both Tok and Nenana are hubs of surrounding interior areas. Nenana is the hub of the "Rivers" area. It is 42 percent Native and it contributes significantly to the sparse population of this district. Tok is a highway hub of surrounding villages.

Interior plaintiffs prefer masters' alternative "B" for Fairbanks. These plaintiffs argue that no deference should be given the governor acting as a party in this phase of the litigation, as distinct from the governor promulgating the Board's plan. They argue that the District 34 in masters' alternative "A" is similar to the District 34 that was found unconstitutional by this court and the supreme court, and that the Board's plan for Fairbanks was highly suspect due to the actions of the chair in drawing up that plan. Finally these plaintiffs suggest a senate pairing of District 35 with the University district. Senate pairings are discussed later in this decision.

### Southeast Conference

Plaintiffs Southeast Conference, et al., object to the City and Borough of Juneau being districted as two single-member house districts, preferring that it be combined as one two-member district. These plaintiffs argue that the masters ignored Instruction 5 which specifically authorized them to create multi-member districts, and misread Instruction 7 to restrict their flexibility rather than to grant them authority to make changes. These plaintiffs note that the masters did, despite their reading of Instruction 7, make changes to Juneau districts, and that all three masters believe that a two-member district is preferable for Juneau. Southeast plaintiffs list the extensive testimony to this court and the Board favoring a single district for Juneau. These plaintiffs point out that this court's decision of May 11 said that the Board had not adequately considered the issue of sin-

gle- versus multi-member districts, and that the supreme court Order of Remand does not address the issue of multi-member districts but specifically states that the Board's guidelines need not be followed. The court has addressed this issue above.

Southeast plaintiffs also object to the masters' placement of the land mass between Petersburg and Wrangell and the Canadian border in the Islands district. They point out that the masters' report and map are inconsistent in this respect, and suggest that the placement may be inadvertent. They argue that this area is more integrated with Petersburg and Wrangell than with the Islands district, pointing to Rep. Jerry Mackie's plan, the state's Department of Community and Regional Affairs "model" borough boundaries, potential road development, fishing in the area, and the lack of evidence in the record to support moving this area from one district to another. Finally, they argue that considerations of contiguity do not require this configuration; both the State's alternative plan "A" and plaintiffs' proposal are contiguous only over water.

The court upholds the masters' intent to incorporate the land mass next to the Canadian border into the Islands district. This area, although not now populated, is contiguous to the Islands district. Adding this area makes that district itself contiguous and the people in that area in the future are as likely to be integrated in the Islands district as in the Sitka–Wrangell–Petersburg district.

### Mat–Su Borough

Plaintiffs Matanuska–Susitna Borough, et al., object to the masters' treatment of the eastern boundary of the rural Mat–Su district, arguing that the district boundary should be the same as the borough boundary. The placement of the boundary, they argue, unnecessarily fragments the borough, placing 1,177 borough residents in the Interior Highways district, and failing to give due consideration to local government boundaries and socio-economic integration. These plaintiffs suggest moving the above population into a Mat–Su district,

replacing them in District 6 by moving Cordova and nearby communities into District 6 from District 35. Mat–Su plaintiffs argue that the proposed highways district has the same infirmities as did District 28 from Governor Hickel's plan which was found unconstitutional partly because it ignored local government boundaries and socio-economic integration within the borough.

The Mat–Su plaintiffs' second objection is to proposed District 26 which combines Wasilla and Chugiak. They argue this proposed district suffers from the same problems as did the governor's District 26, which was found unconstitutional. They argue that the southern boundary of the Mat–Su districts should be the southern boundary of the borough. They point out that this court found that the governor's District 26 was unconstitutional and the supreme court affirmed this finding. They argue that the masters' proposed District 26 still lacks socio-economic integration between the Mat–Su portion and the Chugiak portion. Mat–Su plaintiffs suggest that adding the Chugiak population to Anchorage districts would increase the average Anchorage district population by only 1.18 percent, well within tolerances. The court upholds the masters recommendations with respect to these objections for the reasons stated in their report. The addition of 2600 persons from the Chugiak region does not significantly change the character of the region. The population of District 6 is insufficient to withstand taking 1,266 people out to make the Mat–Su borough boundary tidy. The court believes that preserving the ethnic and cultural unity of the Athabascans and Ahtna and the maintenance of a Native majority district and senate Native influence district weighs more heavily than the preservation of this boundary.

The third objection made by the Mat–Su plaintiffs is with respect to the senate pairing of districts within the borough. They argue that the Wasilla and Palmer house districts should share a senate district. The senate pairing problem stems in part, Mat–Su plaintiffs argue, from the fact that under the masters' senate pairings, An-

chorage will effectively control nine senate seats instead of the 8.2 to which they are entitled using the chosen population base. That objection is dealt with in the senate pairings section of this opinion.

## Alaska Democratic Party

Plaintiff Alaska Democratic Party, et al., (ADP) argue that adoption of the masters's plan will result in rigorous and prolonged Department of Justice review, that the masters' plan does not adequately respect local government boundaries, and that it rubber stamps districts in Anchorage which were likely created based on improper motives. ADP argues that Adak does not have to be districted with the Aleutian Chain, that keeping Adak within the Chain results in many problems, such as a fractured Bristol Bay district. The proper district for Adak is with Elmendorf Air Force Base, ADP argues.

ADP plaintiffs argue that the masters gave undue weight to what the masters understood as a restriction on their authority to redraw districts which were not found unconstitutional. In particular, ADP argues that Master Gillam's deference to the State's litigation proposal was unfounded. Finally, ADP argues that it is error to incorporate into the court's plan Anchorage districts which were created with the strong appearance of impropriety as found by this court. The court deals with these objections in appropriate sections of this opinion.

## Fish and Game Fund

Defendant Fish and Game Fund is not pleased with the masters' proposed reapportionment plan. This plan, they argue, fractures the largest language minority group in rural Alaska, the Yupiks. The Yupik groups are split among District 35, (the Interior Rivers district), District 37, (the Bering Straits district), and District 38, which has a Yupik majority. In Districts 35 and 37, Yupiks are left as a minority in districts controlled by others. Fish and Game Fund's second objection is to the proposed senate pairings, which, they argue, leaves them without a majority in any

senate seat. The court's adoption of State's alternative "A" with respect to Western Alaska meets most of the Fish and Game Fund objections. They had endorsed this plan. To the extent that changes were made they were mostly made in accordance with recommendations that had been made by the Fish and Game Fund. Senate pairings are discussed elsewhere in this opinion.

## State

Defendant State of Alaska recommends that the court adopt House District 26 as proposed by the special masters and by the State in both its alternatives. The State argues that the district is well integrated and that leaving it as they have proposed it will save considerable time and effort in preparing for the election because no district or precinct in Anchorage will have to be changed from the governor's proposed plan.

With respect to Fairbanks, the State argues that masters' alternative "B" should be rejected because it ignores the governor's plan and that alternative "A" should be accepted because it conforms most closely to the governor's plan. Even alternative "A", however, changes every Fairbanks district from the governor's plan. The State argues that the governor's plan for Fairbanks has been through a public process, and that masters' alternative "A" most closely resembles that plan. The State also argues that the advantages claimed in the masters' report for alternative "B" are illusory. For example, the state says, alternative "B" splits ten Voter Tabulation Districts (VTD's), while alternative "A" splits only 18 VTD's, and the related manual work with so-called geographic information files ("GIFing") in the Division of Elections has already been completed for the governor's plan. The stated goal of avoiding a pairing with parts of former District 17 is accomplished as well with alternative A, the state says. The creation of a mixed minority influence district in South Fairbanks in masters' alternative "B" does not justify that plan, the State argues, because mixed minority dis-

tricts have no legal significance, and, in any event, alternative "A" creates two such districts.

With respect to Southwest Alaska, the State recommends that the court adopt the State's alternative plan "A" instead of the plan recommended by the masters. To bolster this recommendation, the State cites the support of the Fish and Game Fund for this proposal and the fact that plan "A" increases the ratio of Alaska Natives in proposed District T, an Alaska Native majority senate district. The State also suggests a system for district numbering.

*Comments and Objections by the Public*

The public—as individuals, organizations, public bodies and public officials—produced an outpouring of comment on the masters' proposed plan. It was a gratifying response to the court's efforts to obtain public input and it dramatically demonstrates the importance of producing a tentative plan, with an invitation for specific comments about how that tentative proposal would work. The masters encouraged just this sort of participation and the court commends this procedure to future boards.

### Prince William Sound

In less than 48 hours, hundreds of people from the Cordova and Eyak region let the court know in writing of their desire to be included in the Prince William Sound district. Whoever organized this effort should be in charge of any future oil spill cleanup. The comments ranged from the gruff to the amusing but they were thoughtful and valuable. They helped convince this court that the socio-economic ties cited unanimously in this public outpouring justified moving Cordova and the Eyak region into District 6.

### Western Alaska

The Aleutian Chain, Bristol Bay, Kodiak and Bethel areas all provided this court with a wealth of materials describing how each area could be districted so as to maximize the particular interests of that area. Unfortunately, given the law and population, not all those needs could be met. The supreme court's decision with respect to Adak and the Voting Rights Act drove deviations the court made from the masters' recommended plan. The masters had adopted the State's alternative "B" for Western Alaska in an effort to keep the Lake and Peninsula Borough intact. The court believed that goal laudable, but the resulting disruption was so severe to communities of interest in Bristol Bay area that the court instead substituted the State's alternative "A" for this region. The court then ran into other considerations and amended that substitution. It turns out that the masters were right and the court amends its substituted plan to conform in many ways with plaintiff Leavitt and defendant Fish and Game Fund proposals. That will make the plan with the other changes much like the masters' plan. The court puts Bethel with the southern District 38 rather than District 37. Bethel is more integrated with the villages around it than it is with Nome. The populations make more sense together.

The court made other minor adjustments to State's alternative "A". The court put Akiak in the Bethel District 37. This is more in keeping with its ethnic background. The court also extended District 38 to make it contiguous with the Kodiak Borough and District 40, including Pedro Bay.

### Kodiak and Aleutian Pairing

The Kodiak and Aleutian traditional senate pairing is simply impossible under the requirements of the Voting Rights Act and the state supreme court's ruling with respect to Adak. That situation is described elsewhere in this opinion.

### Anchorage

Some of the comments received from Anchorage reflect the writers' discomfort with the Board's original decisions about that community. The pairing of Adak with Elmendorf Air Force Base would, indeed, give Anchorage an additional house seat and would require some other re-alignments that well might be improvements in districting in Anchorage as well as all the

rest of the state. However, this court has found that the supreme court's order to keep Adak with the Aleutian Chain, if possible, *is* possible and the court accepts the masters' recommendations to use the Board's reapportionment of Anchorage. No person or group challenged the Anchorage configuration, as opposed to the process of reapportionment, and no illegal configuration in Anchorage has been pointed out to the court.

### Southeast Alaska

As discussed above, some district in Southeast has to "go north" for a senate pairing and that is unattractive. It is, none the less, a requirement of reapportionment. All public comments received said that some other district should be paired with an over-the-water district. The court believes that the most logical pairing is that of the Islands district with the Kodiak district. This creates a Native influence district.

### Fairbanks

Fairbanks, like Anchorage, did not have any litigant in the lawsuit to point out configuration illegalities, other than how redistricting affected District 34. While some public officials do not like the current plan for Fairbanks, it appears best to the court with the changes made as required.

The court received the comments from the Fairbanks masters with respect to Livengood, Central and Circle Hot Springs and from individuals in some of those places. In some ways, the socio-economic relations of those communities are more closely linked with Fairbanks. They are also geographically most properly within District 35 and the court moved them back to that district. At one point, the masters' map with respect to this recommendation actually showed non-contiguous circles around those three communities inside District 35. District 35 is low on population in the court's draft and further taking of non-contiguous areas from within the district directly detracts from its ability to be an acceptable Native influence district. The court took part of the area near Lathrop

Road in Fairbanks District 32 and put it in District 30. Part of District 30 in the College Road area was put in District 29. These adjustments were made to try to equalize the population distribution.

### Conclusion

The Court adopts the masters' recommended plan with the exceptions noted above in detail with respect to each area. The attached maps are illustrative of the court's plan. The reports attached show deviations from ideal size districts and the Native population. A computer diskette of this mapped plan is today provided to the division of elections.

Some of the court's changes are:

The court substituted the State's alternative "A" in Western Alaska and then modified it much in the way that had been suggested by the Fish and Game Fund and the North Slope plaintiffs. Bethel is put in District 38, Akiak is put in District 37, Tuluksak was moved from District 38 to District 35. Pedro Bay and nearby population was moved from 35 to 38.

Teller is left in 36 because that district is underpopulated.

The court moved Cordova and the Eyak communities from District 35 to the Prince William Sound/Interior Roads District 6.

Kenney Lake, Tonsina, Copper Center, part of Mentasta, areas around Gulkana and Gakona and Tok were moved from District 6 to District 35.

Nenana was moved from District 29 to District 35.

Parts of Fairbanks near Lathrop were moved from 32 to 30 and parts near College Road were moved to 29 from 30.

Livengood, Circle Hot Springs and Central are moved back into District 35.

This configuration with the corresponding senate pairings preserves all necessary Native majority and influence districts. It does not pair incumbent Natives against other Natives.

The court accepts the masters' recommendations with the exceptions noted and orders that the plan be effective until a permanent plan be produced by the reap-

/s/ Larry Weeks
Larry Weeks
Superior Court Judge

portionment board.[28] The matter is remanded to the reapportionment board for preparation of a permanent plan in accordance with the supreme court's order and opinion.

Dated June 18, 1992

## ALASKA NATIVE MAJORITY AND INFLUENCE DISTRICTS

### COURT INTERIM PLAN

#### With Senate Pairings

| Senate Dist | Percent Native | House District | Percent Native | House District | Percent Native |
|---|---|---|---|---|---|
| A | 15.47% | 1 Ketchikan | 13.21% | 3 Sitka–Wrangell–Petersburg | 17.64% |
| B * | 26.39 | 2 S.E. Islands * | .35.39 | 40 Kodiak | 17.50 |
| C | 12.51 | 4 Juneau Downtown | 16.29 | 5 Mendenhall–Lynn Canal | 8.66 |
| D | 5.69 | 7 Homer–Kalifonsky | 4.58 | 9 Kenai | 6.81 |
| E | 6.96 | 8 Soldotna–Seward | 6.37 | 6 Prince William Sound | 7.58 |
| F | 3.92 | 10 Ocean View | 3.07 | 18 Hillside | 7.49 |
| G | 6.36 | 11 West Anchorage | 6.23 | 12 Sand Lake | 6.49 |
| H | 4.17 | 13 Coastal Trail | 2.24 | 15 Downtown–Spenard | 6.09 |
| I | 7.37 | 14 Elmendorf | 8.31 | 16 Fairview–Mountain View | 6.41 |
| J | 11.81 | 17 Campbell–Dimond | 4.28 | 20 Midtown | 19.28 |
| K | 8.71 | 19 Lake Otis–Tudor | 12.16 | 22 East Anchorage # 2 | 5.27 |
| L | 4.29 | 21 East Anchorage | 4.67 | 23 Northeast Anchorage | 3.91 |
| M | 3.81 | 24 Muldoon–Eagle R. | 4.19 | 25 Eagle R.–Chugiak | 1.82 |
| N | 4.69 | 26 Chugiak–Wasilla | 4.84 | 27 Palmer | 4.54 |
| O | 4.38 | 28 Rural Mat–Su | 4.09 | 29 Chena–Denali | 4.68 |
| P | 9.59 | 30 W. Fairbanks | 9.12 | 31 Fairbanks Downtown | 10.05 |
| Q | 5.16 | 32 S. Fairbanks | 8.19 | 34 North Pole–Eielson | 2.04 |
| R * | 33.51 | 33 Fox–Badger | 5.86 | 35 Interior Rivers ** | 60.67 |
| S ** | 81.21 | 36 Arctic Slope–NW ** | 79.66 | 37 Nome–Bethel ** | 82.65 |
| T ** | 50.58 | 38 Bristol Bay ** | 77.76 | 39 Aleutians * | 25.63 |

* Alaska Native Influence District
** Alaska Native Majority District

### PLAN DEVIATIONS FROM IDEAL POPULATION

#### COURT INTERIM PLAN

##### With Senate Pairings

| Sen. Dist. | Dev. | House District | House District |
|---|---|---|---|
| A | 4.02% | 1 Ketchikan | 3 Sitka–Petersburg |
| B | −1.30 | 2 S.E. Islands | 40 Kodiak |
| C | −2.11 | 4 Juneau Downtown | 5 Mendenhall–Lynn Canal |
| D | 0.90 | 7 Homer–Kalifonsky | 9 Kenai |
| E | −1.79 | 8 Soldotna–Seward | 6 Prince William Sound |

**28.** The plan meets the maximum deviations allowed overall and maximum allowed without justification under the federal law or Alaska Constitution. The districts meet the Alaska constitutional requirements except when those requirements had to yield to the Voting Rights Act. The masters are to be commended and thanked by the citizens of Alaska for their willingness to contribute to the State.

## APPENDIX E—Continued

| Sen. Dist. | Dev. | House District | | House District |
|---|---|---|---|---|
| F | 1.23 | 10 Ocean View | | 18 Hillside |
| G | 1.39 | 11 West Anchorage | | 12 Sand Lake |
| H | 1.47 | 13 Coastal Trail | | 15 Downtown–Spenard |
| I | 0.64 | 14 Elmendorf | | 16 Fairview–Mtn View |
| J | 0.80 | 17 Campbell–Dimond | | 20 Midtown |
| K | 0.80 | 19 Lake Otis–Tudor | | 22 East Anchorage # 2 |
| L | 1.20 | 21 East Anchorage | | 23 Northeast Anchorage |
| M | 0.86 | 24 Muldoon–Eagle R. | | 25 Eagle R.–Chugiak |
| N | 0.35 | 26 Chugiak–Wasilla | | 27 Palmer |
| O | −3.15 | 28 Rural Mat–Su | | 29 Chena–Denali |
| P | −2.50 | 30 W. Fairbanks | | 31 Fairbanks Downtown |
| Q | −2.92 | 32 S. Fairbanks | | 34 North Pole–Eielson |
| R | −4.55 | 33 Fox–Badger | | 35 Interior Rivers |
| S | 0.83 | 36 Arctic Slope–NW | | 37 Nome–Bethel |
| T | 3.85 | 38 Bristol Bay | | 39 Aleutians |

Total Deviation: Senate = 8.57% House = 13.67%

6/18/92 PAGE 1

### Population Summary Report

| District | Population | Deviation | Pct. Dev. |
|---|---|---|---|
| 1 | 13,985 | 234 | 1.70 |
| 2 | 13,483 | − 268 | − 1.95 |
| 3 | 14,622 | 871 | 6.33 |
| 4 | 13,595 | − 156 | − 1.13 |
| 5 | 13,324 | − 427 | − 3.11 |
| 6 | 13,215 | − 536 | − 3.90 |
| 7 | 13,941 | 190 | 1.38 |
| 8 | 13,793 | 42 | 0.31 |
| 9 | 13,810 | 59 | 0.43 |
| 10 | 13,966 | 215 | 1.56 |
| 11 | 13,964 | 213 | 1.55 |
| 12 | 13,919 | 168 | 1.22 |
| 13 | 13,925 | 174 | 1.27 |
| 14 | 13,928 | 177 | 1.29 |
| 15 | 13,981 | 230 | 1.67 |
| 16 | 13,751 | 0 | 0.00 |
| 17 | 13,807 | 56 | 0.41 |
| 18 | 13,876 | 125 | 0.91 |
| 19 | 13,859 | 108 | 0.79 |
| 20 | 13,915 | 164 | 1.19 |
| 21 | 13,933 | 182 | 1.32 |
| 22 | 13,863 | 112 | 0.81 |
| 23 | 13,898 | 147 | 1.07 |
| 24 | 13,805 | 54 | 0.39 |
| 25 | 13,934 | 183 | 1.33 |
| 26 | 13,628 | − 123 | − 0.89 |
| 27 | 13,970 | 219 | 1.59 |
| 28 | 13,537 | − 214 | − 1.56 |
| 29 | 13,104 | − 647 | − 4.71 |
| 30 | 13,263 | − 488 | − 3.55 |
| 31 | 13,550 | − 201 | − 1.46 |
| 32 | 13,534 | − 217 | − 1.58 |
| 33 | 13,010 | − 741 | − 5.39 |
| 34 | 13,160 | − 591 | − 4.30 |
| 35 | 13,242 | − 509 | − 3.70 |
| 36 | 13,346 | − 405 | − 2.95 |
| 37 | 14,383 | 632 | 4.60 |
| 38 | 13,670 | − 81 | − 0.59 |

| District | Population | Deviation | Pct. Dev. |
|----------|-----------|-----------|-----------|
| 39 | 14,890 | 1,139 | 8.28 |
| 40 | 13,664 | − 87 | − 0.63 |
| | 550,043 | 3 | 0.02 |

| | |
|---|---|
| Plan Type | ASSEMBLY |
| Plan name | COURTFIN |
| Date | June 18, |
| Time | 3:00 PM |
| User | lizik |

| | |
|---|---|
| Mean Deviation is: | 284 |
| Mean Percent Deviation is: | 2.07 |

| | | |
|---|---|---|
| Largest Positive Deviation is: | 1,139 | 8.28 Percent |
| Largest Negative Deviation is: | − 741 | − 5.39 Percent |
| Overall Range in Deviation is: | 1,880 | 13.67 Percent |

| | |
|---|---|
| Plan Type | ASSEMBLY |
| Plan name | COURTFIN |
| Date | June 18, |
| Time | 3:00 PM |
| User | lizik |

## DISTRICT No. 1

| | |
|---|---|
| Total Population | 13,985 |
| Deviation | 234 |
| Dev. Percentage | 1.70 |
| Total 18 + | 9,831 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---------|---------|----------|---------|---------|---------|
| Group Total | 11,331 | 55 | 286 | 1,847 | 460 | 6 |
| % of Total Pop. | 81.02 | 0.39 | 2.05 | 13.21 | 3.29 | 0.04 |
| 18 + | 8,160 | 47 | 159 | 1,163 | 300 | 2 |
| % of Total 18 + | 83.00 | 0.48 | 1.62 | 11.83 | 3.05 | 0.02 |

## DISTRICT No. 2

| | |
|---|---|
| Total Population | 13,483 |
| Deviation | − 268 |
| Dev. Percentage | − 1.95 |
| Total 18 + | 9,157 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---------|---------|----------|---------|---------|---------|
| Group Total | 8,397 | 16 | 218 | 4,771 | 75 | 6 |
| % of Total Pop. | 62.28 | 0.12 | 1.62 | 35.39 | 0.56 | 0.04 |
| 18 + | 6,083 | 8 | 127 | 2,887 | 48 | 4 |
| % of Total 18 + | 66.43 | 0.09 | 1.39 | 31.53 | 0.52 | 0.04 |

## DISTRICT No. 3

| Total Population | 14,622 |
| Deviation | 871 |
| Dev. Percentage | 6.33 |
| Total 18 + | 10,165 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,267 | 50 | 323 | 2,579 | 403 | 0 |
| % of Total Pop. | 77.06 | 0.34 | 2.21 | 17.64 | 2.76 | 0.00 |
| 18 + | 8,055 | 33 | 208 | 1,597 | 272 | 0 |
| % of Total 18 + | 79.24 | 0.32 | 2.05 | 15.71 | 2.68 | 0.00 |

## DISTRICT No. 4

| Total Population | 13,595 |
| Deviation | − 156 |
| Dev. Percentage | − 1.13 |
| Total 18 + | 10,062 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 10,265 | 121 | 424 | 2,215 | 568 | 2 |
| % of Total Pop. | 75.51 | 0.89 | 3.12 | 16.29 | 4.18 | 0.01 |
| 18 + | 7,904 | 93 | 248 | 1,415 | 401 | 1 |
| % of Total 18 + | 78.55 | 0.92 | 2.46 | 14.06 | 3.99 | 0.01 |

## DISTRICT No. 5

| Total Population | 13,324 |
| Deviation | − 427 |
| Dev. Percentage | − 3.11 |
| Total 18 + | 8,957 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,150 | 158 | 326 | 1,154 | 529 | 7 |
| % of Total Pop. | 83.68 | 1.19 | 2.45 | 8.66 | 3.97 | 0.05 |
| 18 + | 7,707 | 93 | 186 | 643 | 324 | 4 |
| % of Total 18 + | 86.04 | 1.04 | 2.08 | 7.18 | 3.62 | 0.04 |

## DISTRICT No. 6

| Total Population | 13,215 |
| Deviation | − 536 |
| Dev. Percentage | − 3.90 |
| Total 18 + | 9,197 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,061 | 369 | 402 | 1,002 | 378 | 3 |
| % of Total Pop. | 83.70 | 2.79 | 3.04 | 7.58 | 2.86 | 0.02 |
| 18 + | 7,776 | 246 | 250 | 671 | 252 | 2 |
| % of Total 18 + | 84.55 | 2.67 | 2.72 | 7.30 | 2.74 | 0.02 |

## DISTRICT No. 7

| | |
|---|---|
| Total Population | 13,941 |
| Deviation | 190 |
| Dev. Percentage | 1.38 |
| Total 18 + | 9,194 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 12,954 | 28 | 200 | 638 | 120 | 1 |
| % of Total Pop. | 92.92 | 0.20 | 1.43 | 4.58 | 0.86 | 0.01 |
| 18 + | 8,596 | 16 | 120 | 394 | 67 | 1 |
| % of Total 18 + | 93.50 | 0.17 | 1.31 | 4.29 | 0.73 | 0.01 |

## DISTRICT No. 8

| | |
|---|---|
| Total Population | 13,793 |
| Deviation | 42 |
| Dev. Percentage | 0.31 |
| Total 18 + | 9,436 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 12,436 | 82 | 249 | 878 | 142 | 6 |
| % of Total Pop. | 90.16 | 0.59 | 1.81 | 6.37 | 1.03 | 0.04 |
| 18 + | 8,542 | 68 | 139 | 604 | 81 | 2 |
| % of Total 18 + | 90.53 | 0.72 | 1.47 | 6.40 | 0.86 | 0.02 |

## DISTRICT No. 9

| | |
|---|---|
| Total Population | 13,810 |
| Deviation | 59 |
| Dev. Percentage | 0.43 |
| Total 18 + | 9,382 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 12,343 | 86 | 292 | 940 | 146 | 3 |
| % of Total Pop. | 89.38 | 0.62 | 2.11 | 6.81 | 1.06 | 0.02 |
| 18 + | 8,460 | 58 | 167 | 603 | 92 | 2 |
| % of Total 18 + | 90.17 | 0.62 | 1.78 | 6.43 | 0.98 | 0.02 |

## DISTRICT No. 10

| | |
|---|---|
| Total Population | 13,966 |
| Deviation | 215 |
| Dev. Percentage | 1.56 |
| Total 18 + | 9,383 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 12,401 | 290 | 387 | 429 | 440 | 19 |
| % of Total Pop. | 88.79 | 2.08 | 2.77 | 3.07 | 3.15 | 0.14 |
| 18 + | 8,414 | 177 | 238 | 263 | 282 | 9 |
| % of Total 18 + | 89.67 | 1.89 | 2.54 | 2.80 | 3.01 | 0.10 |

## DISTRICT No. 11

| Total Population | 13,964 |
|---|---|
| Deviation | 213 |
| Dev. Percentage | 1.55 |
| Total 18 + | 9,778 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,245 | 671 | 494 | 870 | 672 | 12 |
| % of Total Pop. | 80.53 | 4.81 | 3.54 | 6.23 | 4.81 | 0.09 |
| 18 + | 8,109 | 394 | 288 | 541 | 438 | 8 |
| % of Total 18 + | 82.93 | 4.03 | 2.95 | 5.53 | 4.48 | 0.08 |

## DISTRICT No. 12

| Total Population | 13,919 |
|---|---|
| Deviation | 168 |
| Dev. Percentage | 1.22 |
| Total 18 + | 9,604 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 10,825 | 902 | 589 | 903 | 677 | 23 |
| % of Total Pop. | 77.77 | 6.48 | 4.23 | 6.49 | 4.86 | 0.17 |
| 18 + | 7,718 | 546 | 350 | 544 | 439 | 7 |
| % of Total 18 + | 80.36 | 5.69 | 3.64 | 5.66 | 4.57 | 0.07 |

## DISTRICT No. 13

| Total Population | 13,925 |
|---|---|
| Deviation | 174 |
| Dev. Percentage | 1.27 |
| Total 18+ | 9,402 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 12,898 | 188 | 264 | 312 | 260 | 3 |
| % of Total Pop. | 92.62 | 1.35 | 1.90 | 2.24 | 1.87 | 0.02 |
| 18+ | 8,810 | 112 | 166 | 168 | 143 | 3 |
| % of Total 18+ | 93.70 | 1.19 | 1.77 | 1.79 | 1.52 | 0.03 |

## DISTRICT No. 14

| Total Population | 13,928 |
|---|---|
| Deviation | 177 |
| Dev. Percentage | 1.29 |
| Total 18+ | 9,865 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 10,402 | 1,157 | 562 | 1,157 | 634 | 16 |
| % of Total Pop. | 74.68 | 8.31 | 4.04 | 8.31 | 4.55 | 0.11 |
| 18+ | 7,687 | 754 | 329 | 662 | 428 | 5 |
| % of Total 18+ | 77.92 | 7.64 | 3.34 | 6.71 | 4.34 | 0.05 |

## DISTRICT No. 15

| | |
|---|---|
| Total Population | 13,981 |
| Deviation | 230 |
| Dev. Percentage | 1.67 |
| Total 18+ | 10,286 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,339 | 527 | 516 | 851 | 739 | 9 |
| % of Total Pop. | 81.10 | 3.77 | 3.69 | 6.09 | 5.29 | 0.06 |
| 18+ | 8,574 | 347 | 324 | 532 | 504 | 5 |
| % of Total 18+ | 83.36 | 3.37 | 3.15 | 5.17 | 4.90 | 0.05 |

## DISTRICT No. 16

| | |
|---|---|
| Total Population | 13,751 |
| Deviation | 0 |
| Dev. Percentage | 0.00 |
| Total 18+ | 10,419 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,002 | 687 | 401 | 882 | 763 | 16 |
| % of Total Pop. | 80.01 | 5.00 | 2.92 | 6.41 | 5.55 | 0.12 |
| 18+ | 8,541 | 467 | 261 | 602 | 541 | 7 |
| % of Total 18+ | 81.98 | 4.48 | 2.51 | 5.78 | 5.19 | 0.07 |

## DISTRICT No. 17

| | |
|---|---|
| Total Population | 13,807 |
| Deviation | 56 |
| Dev. Percentage | 0.41 |
| Total 18+ | 9,615 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,333 | 472 | 447 | 591 | 953 | 11 |
| % of Total Pop. | 82.08 | 3.42 | 3.24 | 4.28 | 6.90 | 0.08 |
| 18+ | 8,048 | 295 | 297 | 351 | 621 | 3 |
| % of Total 18+ | 83.70 | 3.07 | 3.09 | 3.65 | 6.46 | 0.03 |

## DISTRICT No. 18

| | |
|---|---|
| Total Population | 13,876 |
| Deviation | 125 |
| Dev. Percentage | 0.91 |
| Total 18+ | 10,549 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,415 | 287 | 458 | 663 | 1,040 | 13 |
| % of Total Pop. | 82.26 | 2.07 | 3.30 | 4.78 | 7.49 | 0.09 |
| 18+ | 8,902 | 187 | 310 | 434 | 711 | 5 |
| % of Total 18+ | 84.39 | 1.77 | 2.94 | 4.11 | 6.74 | 0.05 |

DISTRICT No. 19

| Total Population | 13,859 |
|---|---|
| Deviation | 108 |
| Dev. Percentage | 0.79 |
| Total 18+ | 11,230 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 9,696 | 662 | 797 | 1,685 | 997 | 22 |
| % of Total Pop. | 69.96 | 4.78 | 5.75 | 12.16 | 7.19 | 0.16 |
| 18+ | 8,266 | 485 | 557 | 1,195 | 714 | 13 |
| % of Total 18+ | 73.61 | 4.32 | 4.96 | 10.64 | 6.36 | 0.12 |

DISTRICT No. 20

| Total Population | 13,915 |
|---|---|
| Deviation | 164 |
| Dev. Percentage | 1.19 |
| Total 18+ | 10,167 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 7,265 | 1,864 | 1,101 | 2,683 | 979 | 23 |
| % of Total Pop. | 52.21 | 13.40 | 7.91 | 19.28 | 7.04 | 0.17 |
| 18+ | 5,788 | 1,244 | 698 | 1,772 | 659 | 6 |
| % of Total 18+ | 56.93 | 12.24 | 6.87 | 17.43 | 6.48 | 0.06 |

DISTRICT No. 21

| Total Population | 13,933 |
|---|---|
| Deviation | 182 |
| Dev. Percentage | 1.32 |
| Total 18+ | 9,704 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 10,949 | 1,176 | 601 | 651 | 538 | 18 |
| % of Total Pop. | 78.58 | 8.44 | 4.31 | 4.67 | 3.86 | 0.13 |
| 18+ | 7,853 | 717 | 357 | 389 | 380 | 8 |
| % of Total 18+ | 80.93 | 7.39 | 3.68 | 4.01 | 3.92 | 0.08 |

DISTRICT No. 22

| Total Population | 13,863 |
|---|---|
| Deviation | 112 |
| Dev. Percentage | 0.81 |
| Total 18+ | 9,166 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 9,967 | 1,713 | 740 | 730 | 698 | 15 |
| % of Total Pop. | 71.90 | 12.36 | 5.34 | 5.27 | 5.03 | 0.11 |
| 18+ | 6,745 | 1,080 | 418 | 435 | 480 | 8 |
| % of Total 18+ | 73.59 | 11.78 | 4.56 | 4.75 | 5.24 | 0.09 |

DISTRICT No. 23

Total Population 13,898
 Deviation 147
Dev. Percentage 1.07
 Total 18+ 9,323

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|------------|---------|---------|----------|---------|---------|---------|
| Group Total | 9,524 | 2,422 | 949 | 544 | 444 | 15 |
| % of Total Pop. | 68.53 | 17.43 | 6.83 | 3.91 | 3.19 | 0.11 |
| 18+ | 6,567 | 1,554 | 575 | 328 | 294 | 5 |
| % of Total 18+ | 70.44 | 16.67 | 6.17 | 3.52 | 3.15 | 0.05 |

DISTRICT No. 24

Total Population 13,805
 Deviation 54
Dev. Percentage 0.39
 Total 18+ 9,248

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|------------|---------|---------|----------|---------|---------|---------|
| Group Total | 11,612 | 800 | 524 | 578 | 282 | 9 |
| % of Total Pop. | 84.11 | 5.80 | 3.80 | 4.19 | 2.04 | 0.07 |
| 18+ | 7,849 | 522 | 303 | 385 | 186 | 3 |
| % of Total 18+ | 84.87 | 5.64 | 3.28 | 4.16 | 2.01 | 0.03 |

DISTRICT No. 25

Total Population 13,934
 Deviation 183
Dev. Percentage 1.33
 Total 18+ 9,153

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|------------|---------|---------|----------|---------|---------|---------|
| Group Total | 12,589 | 272 | 333 | 480 | 253 | 7 |
| % of Total Pop. | 90.35 | 1.95 | 2.39 | 3.44 | 1.82 | 0.05 |
| 18+ | 8,363 | 153 | 186 | 292 | 157 | 2 |
| % of Total 18+ | 91.37 | 1.67 | 2.03 | 3.19 | 1.72 | 0.02 |

DISTRICT No. 26

Total Population 13,628
 Deviation − 123
Dev. Percentage − 0.89
 Total 18+ 8,669

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|------------|---------|---------|----------|---------|---------|---------|
| Group Total | 12,418 | 106 | 312 | 659 | 126 | 7 |
| % of Total Pop. | 91.12 | 0.78 | 2.29 | 4.84 | 0.92 | 0.05 |
| 18+ | 7,976 | 62 | 169 | 388 | 68 | 6 |
| % of Total 18+ | 92.01 | 0.72 | 1.95 | 4.48 | 0.78 | 0.07 |

DISTRICT No. 27

| Total Population | 13,970 |
|---|---|
| Deviation | 219 |
| Dev. Percentage | 1.59 |
| Total 18+ | 9,000 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 12,880 | 121 | 244 | 634 | 90 | 1 |
| % of Total Pop. | 92.20 | 0.87 | 1.75 | 4.54 | 0.64 | 0.01 |
| 18+ | 8,403 | 62 | 127 | 349 | 58 | 1 |
| % of Total 18+ | 93.37 | 0.69 | 1.41 | 3.88 | 0.64 | 0.01 |

DISTRICT No. 28

| Total Population | 13,537 |
|---|---|
| Deviation | − 214 |
| Dev. Percentage | − 1.56 |
| Total 18+ | 8,810 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 12,568 | 60 | 249 | 553 | 105 | 2 |
| % of Total Pop. | 92.84 | 0.44 | 1.84 | 4.09 | 0.78 | 0.01 |
| 18+ | 8,260 | 38 | 128 | 326 | 58 | 0 |
| % of Total 18+ | 93.76 | 0.43 | 1.45 | 3.70 | 0.66 | 0.00 |

DISTRICT No. 29

| Total Population | 13,104 |
|---|---|
| Deviation | − 647 |
| Dev. Percentage | − 4.71 |
| Total 18+ | 9,206 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,982 | 114 | 225 | 613 | 162 | 8 |
| % of Total Pop. | 91.44 | 0.87 | 1.72 | 4.68 | 1.24 | 0.06 |
| 18+ | 8,500 | 85 | 139 | 371 | 108 | 3 |
| % of Total 18+ | 92.33 | 0.92 | 1.51 | 4.03 | 1.17 | 0.03 |

DISTRICT No. 30

| Total Population | 13,263 |
|---|---|
| Deviation | − 488 |
| Dev. Percentage | − 3.55 |
| Total 18+ | 9,611 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 10,392 | 704 | 425 | 1,210 | 519 | 13 |
| % of Total Pop. | 78.35 | 5.31 | 3.20 | 9.12 | 3.91 | 0.10 |
| 18+ | 7,685 | 479 | 267 | 781 | 387 | 12 |
| % of Total 18+ | 79.96 | 4.98 | 2.78 | 8.13 | 4.03 | 0.12 |

## DISTRICT No. 31

| | |
|---|---|
| Total Population | 13,550 |
| Deviation | − 201 |
| Dev. Percentage | − 1.46 |
| Total 18+ | 9,810 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 10,489 | 858 | 516 | 1,362 | 303 | 22 |
| % of Total Pop. | 77.41 | 6.33 | 3.81 | 10.05 | 2.24 | 0.16 |
| 18+ | 7,805 | 519 | 336 | 932 | 212 | 6 |
| % of Total 18+ | 79.56 | 5.29 | 3.43 | 9.50 | 2.16 | 0.06 |

## DISTRICT No. 32

| | |
|---|---|
| Total Population | 13,534 |
| Deviation | − 217 |
| Dev. Percentage | − 1.58 |
| Total 18+ | 9,238 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 8,348 | 2,585 | 971 | 1,109 | 509 | 12 |
| % of Total Pop. | 61.68 | 19.10 | 7.17 | 8.19 | 3.76 | 0.09 |
| 18+ | 5,904 | 1,744 | 599 | 638 | 345 | 8 |
| % of Total 18+ | 63.91 | 18.88 | 6.48 | 6.91 | 3.73 | 0.09 |

## DISTRICT No. 33

| | |
|---|---|
| Total Population | 13,010 |
| Deviation | − 741 |
| Dev. Percentage | − 5.39 |
| Total 18+ | 8,431 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,648 | 224 | 230 | 762 | 141 | 5 |
| % of Total Pop. | 89.53 | 1.72 | 1.77 | 5.86 | 1.08 | 0.04 |
| 18+ | 7,669 | 128 | 144 | 408 | 80 | 2 |
| % of Total 18+ | 90.96 | 1.52 | 1.71 | 4.84 | 0.95 | 0.02 |

## DISTRICT No. 34

| | |
|---|---|
| Total Population | 13,160 |
| Deviation | −591 |
| Dev. Percentage | −4.30 |
| Total 18+ | 8,445 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,083 | 936 | 564 | 268 | 295 | 14 |
| % of Total Pop. | 84.22 | 7.11 | 4.29 | 2.04 | 2.24 | 0.11 |
| 18+ | 7,245 | 564 | 292 | 153 | 184 | 7 |
| % of Total 18+ | 85.79 | 6.68 | 3.46 | 1.81 | 2.18 | 0.08 |

## DISTRICT No. 35

| | |
|---|---|
| Total Population | 13,242 |
| Deviation | − 509 |
| Dev. Percentage | − 3.70 |
| Total 18+ | 8,445 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 4,927 | 87 | 142 | 8,034 | 49 | 3 |
| % of Total Pop. | 37.21 | 0.66 | 1.07 | 60.67 | 0.37 | 0.02 |
| 18+ | 3,632 | 66 | 72 | 4,639 | 33 | 3 |
| % of Total 18+ | 43.01 | 0.78 | 0.85 | 54.93 | 0.39 | 0.04 |

## DISTRICT No. 36

| | |
|---|---|
| Total Population | 13,346 |
| Deviation | −405 |
| Dev. Percentage | −2.95 |
| Total 18+ | 7,953 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 2,182 | 49 | 163 | 10,632 | 313 | 7 |
| % of Total Pop. | 16.35 | 0.37 | 1.22 | 79.66 | 2.35 | 0.05 |
| 18+ | 1,744 | 41 | 96 | 5,850 | 219 | 3 |
| % of Total 18+ | 21.93 | 0.52 | 1.21 | 73.56 | 2.75 | 0.04 |

## DISTRICT No. 37

| | |
|---|---|
| Total Population | 14,383 |
| Deviation | 632 |
| Dev. Percentage | 4.60 |
| Total 18+ | 8,445 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 2,275 | 21 | 120 | 11,888 | 75 | 4 |
| % of Total Pop. | 15.82 | 0.15 | 0.83 | 82.65 | 0.52 | 0.03 |
| 18+ | 1,666 | 14 | 67 | 6,647 | 49 | 2 |
| % of Total 18+ | 19.73 | 0.17 | 0.79 | 78.71 | 0.58 | 0.02 |

## DISTRICT No. 38

| | |
|---|---|
| Total Population | 13,670 |
| Deviation | − 81 |
| Dev. Percentage | − 0.59 |
| Total 18+ | 8,477 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 2,738 | 58 | 122 | 10,630 | 109 | 13 |
| % of Total Pop. | 20.03 | 0.42 | 0.89 | 77.76 | 0.80 | 0.10 |
| 18+ | 2,041 | 34 | 75 | 6,251 | 71 | 5 |
| % of Total 18+ | 24.08 | 0.40 | 0.88 | 73.74 | 0.84 | 0.06 |

DISTRICT No. 39

| | | | | |
|---|---|---|---|
| Total Population | 14,890 |
| Deviation | 1,139 |
| Dev. Percentage | 8.28 |
| Total 18+ | 11,487 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 8,059 | 688 | 973 | 3,816 | 1,342 | 12 |
| % of Total Pop | 54.12 | 4.62 | 6.53 | 25.63 | 9.01 | 0.08 |
| 18+ | 6,519 | 573 | 852 | 2,349 | 1,182 | 12 |
| % of Total 18+ | 56.75 | 4.99 | 7.42 | 20.45 | 10.29 | 0.10 |

DISTRICT No. 40

| | |
|---|---|
| Total Population | 13,664 |
| Deviation | − 87 |
| Dev. Percentage | − 0.63 |
| Total 18+ | 9,399 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 9,067 | 133 | 664 | 2,391 | 1,402 | 7 |
| % of Total Pop. | 66.36 | 0.97 | 4.86 | 17.50 | 10.26 | 0.05 |
| 18+ | 6,410 | 95 | 424 | 1,483 | 985 | 2 |
| % of Total 18+ | 68.20 | 1.01 | 4.51 | 15.78 | 10.48 | 0.02 |

Prince William Sound

REDISTRICTING PLAN

Scale 1 : 23582

BETHEL AREA

Fairbanks

## APPENDIX F

### IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

### FIRST JUDICIAL DISTRICT AT JUNEAU

[Filed June 19, 1992]

Case No. 1JU-91-1608 Civil

### MEMORANDUM AND ORDER

The Fish and Game Fund has moved for reconsideration of the court's decision on reapportionment, pointing out that Native incumbents are paired against one another. All plaintiffs join in the motion, and the State agrees in substance.[1] Representative Ivan M. Ivan, a Yupik Eskimo from Akiak is pitted against Representative Richard Foster, an Inupiak from Nome, in the court's interim reapportionment plan.

The court erred.[2]

While the pairing or not pairing of Native incumbents is not a driving force in reapportionment it is something that the courts have considered under the Voting

---

1. The State argues that this court no longer has jurisdiction because the date specified in the supreme court's Order of Remand, June 18, 1992, has passed. The court believes it has jurisdiction to correct this error. Civil Rule 60(b)(1). This is a rather odd position for the State to take in light of its motion earlier today for the court to take action it requested in the case.

2. The court made this error out of ignorance. At the time of issuing its decision, the court was unaware of the impact on any incumbent candidates except certain Alaska Native candidates to which the court's attention had been drawn and certain Southeast Alaska candidates of which the court may have had personal knowledge. Obviously the court did not know enough.

Rights Act.[3] The court also understands that the Department of Justice uses a "totality of circumstances" approach in its preclearance review and considers whether proposed plans pit minority candidates against each other. The court attempted to avoid such problems where other legal requirements could be met.

Fish and Game Fund points out that placing Akiak in the district with Nome and Pedro Bay in the district with Bethel inevitably places two Alaska Native incumbent candidates against each other.

The court believes that Akiak can be placed in either 37 or 38 and meet socioeconomic integration standards. Pedro Bay has traditionally been associated with District 39. These changes require that Clark's Point be placed in District 38 and that change will also be made.

IT IS ORDERED that the motion to reconsider is granted. The court amends the 6/19/92

previously published decision in this case to place Pedro Bay with its traditional Aleutians District, District 39, and Akiak is placed with Bethel in District 38. Clark's point precinct is moved to District 38 to minimize the population deviation for District 39 which is the most overpopulated district. That District has to be overpopulated to maintain it as a Native influence district under the Voting Rights Act. The heavy concentration of non-Native population at the Adak Naval Air Station skews the natural civilian ethnic make-up of the region.

Attached to this is Order is a summary report showing new population deviations from the ideal district and the minority population statistics based on this Order.

Dated June 19, 1992

/s/Larry Weeks
Larry Weeks
Superior Court Judge

PAGE 1

### Population Summary Report

| District | Population | Deviation | Pct. Dev. |
|---|---|---|---|
| 1 | 13,985 | 234 | 1.70 |
| 2 | 13,480 | − 272 | − 1.97 |
| 3 | 14,622 | 871 | 6.33 |
| 4 | 13,598 | − 153 | − 1.11 |
| 5 | 13,324 | − 427 | − 3.11 |
| 6 | 13,215 | − 536 | − 390 |
| 7 | 13,941 | 190 | 1.38 |
| 8 | 13,793 | 42 | 0.31 |
| 9 | 13,810 | 59 | 0.43 |
| 10 | 13,966 | 215 | 1.56 |
| 11 | 13,964 | 213 | 1.55 |
| 12 | 13,919 | 168 | 1.22 |
| 13 | 13,925 | 174 | 1.27 |
| 14 | 13,928 | 177 | 1.29 |
| 15 | 13,981 | 230 | 1.67 |
| 16 | 13,751 | 0 | 0.00 |
| 17 | 13,807 | 56 | 0.41 |
| 18 | 13,876 | 125 | 0.91 |
| 19 | 13,859 | 108 | 0.79 |
| 20 | 13,915 | 164 | 1.19 |
| 21 | 13,933 | 182 | 1.32 |
| 22 | 13,863 | 112 | 0.81 |
| 23 | 13,898 | 147 | 1.07 |
| 24 | 13,805 | 54 | 0.39 |
| 25 | 13,934 | 183 | 1.33 |

3. *Thornburg v. Gingles*, 478 U.S. 30 [106 S.Ct. 2752, 92 L.Ed.2d 25] (1986).

| District | Population | Deviation | Pct. Dev. |
|---|---|---|---|
| 26 | 13,628 | − 123 | − 0.89 |
| 27 | 13,970 | 219 | 1.59 |
| 28 | 13,537 | − 214 | − 1.56 |
| 29 | 13,104 | − 647 | − 4.71 |
| 30 | 13,263 | − 488 | − 3.55 |
| 31 | 13,550 | − 201 | − 1.46 |
| 32 | 13,534 | − 217 | − 1.58 |
| 33 | 13,010 | − 741 | − 5.39 |
| 34 | 13,160 | − 591 | − 4.30 |
| 35 | 13,242 | − 509 | − 3.70 |
| 36 | 13,346 | − 405 | − 2.95 |
| 37 | 14,098 | 347 | 2.52 |
| 38 | 13,858 | 107 | 0.78 |
| 39 | 14,987 | 1,236 | 8.99 |
| 40 | 13,664 | − 87 | − 0.63 |
| | 550,043 | 3 | 0.02 |

| | |
|---|---|
| Plan Type | ASSEMBLY |
| Plan name | COURTF2 |
| Date | June 19, |
| Time | 10:39 AM |
| User | lizik |

| | | |
|---|---|---|
| Mean Deviation is: | 280 | |
| Mean Percent Deviation is: | 2.04 | |
| Largest Positive Deviation is: | 1,236 | 8.99 Percent |
| Largest Negative Deviation is: | − 741 | − 5.39 Percent |
| Overall Range in Deviation is: | 1,977 | 14.38 Percent |

| | |
|---|---|
| Plan Type | ASSEMBLY |
| Plan name | COURTF2 |
| Date | June 19, |
| Time | 10:40 AM |
| User | lizik |

DISTRICT No. 1

| | |
|---|---|
| Total Population | 13,985 |
| Deviation | 234 |
| Dev. Percentage | 1.70 |
| Total 18+ | 9,831 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,331 | 55 | 286 | 1,847 | 460 | 6 |
| % of Total Pop. | 81.02 | 0.39 | 2.05 | 13.21 | 3.29 | 0.04 |
| 18+ | 8,160 | 47 | 159 | 1,163 | 300 | 2 |
| % of Total 18+ | 83.00 | 0.48 | 1.62 | 11.83 | 3.05 | 0.02 |

## DISTRICT No. 2

| Total Population | 13,480 |
|---|---|
| Deviation | − 271 |
| Dev. Percentage | − 1.97 |
| Total 18+ | 9,155 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 8,395 | 16 | 217 | 4,771 | 75 | 6 |
| % of Total Pop. | 62.28 | 0.12 | 1.61 | 35.39 | 0.56 | 0.04 |
| 18+ | 6,081 | 8 | 127 | 2,887 | 48 | 4 |
| % of Total 18+ | 66.42 | 0.09 | 1.39 | 31.53 | 0.52 | 0.04 |

## DISTRICT No. 3

| Total Population | 14,622 |
|---|---|
| Deviation | 871 |
| Dev. Percentage | 6.33 |
| Total 18+ | 10,165 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,267 | 50 | 323 | 2,579 | 403 | 0 |
| % of Total Pop. | 77.06 | 0.34 | 2.21 | 17.64 | 2.76 | 0.00 |
| 18+ | 8,055 | 33 | 208 | 1,597 | 272 | 0 |
| % of Total 18+ | 79.24 | 0.32 | 2.05 | 15.71 | 2.68 | 0.00 |

## DISTRICT No. 4

| Total Population | 13,598 |
|---|---|
| Deviation | − 153 |
| Dev. Percentage | − 1,11 |
| Total 18+ | 10,064 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 10,267 | 121 | 425 | 2,215 | 568 | 2 |
| % of Total Pop. | 75.50 | 0.89 | 3.13 | 16.29 | 4.18 | 0.01 |
| 18+ | 7,906 | 93 | 248 | 1,415 | 401 | 1 |
| % of Total 18+ | 78.56 | 0.92 | 2.46 | 14.05 | 3.98 | 0.01 |

## DISTRICT No. 5

| Total Population | 13,324 |
|---|---|
| Deviation | − 427 |
| Dev. Percentage | − 3.11 |
| Total 18+ | 8,957 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,150 | 158 | 326 | 1,154 | 529 | 7 |
| % of Total Pop. | 83.68 | 1.19 | 2.45 | 8.66 | 3.97 | 0.05 |
| 18+ | 7,707 | 93 | 186 | 643 | 324 | 4 |
| % of Total 18+ | 86.04 | 1.04 | 2.08 | 7.18 | 3.62 | 0.04 |

## DISTRICT No. 6

| Total Population | 13,215 |
|---|---|
| Deviation | − 536 |
| Dev. Percentage | − 3.90 |
| Total 18+ | 9,197 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,061 | 369 | 402 | 1,002 | 378 | 3 |
| % of Total Pop. | 83.70 | 2.79 | 3.04 | 7.58 | 2.86 | 0.02 |
| 18+ | 7,776 | 246 | 250 | 671 | 252 | 2 |
| % of Total 18+ | 84.55 | 2.67 | 2.72 | 7.30 | 2.74 | 0.02 |

## DISTRICT No. 7

| Total Population | 13,941 |
|---|---|
| Deviation | 190 |
| Dev. Percentage | 1.38 |
| Total 18+ | 9,194 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 12,954 | 28 | 200 | 638 | 120 | 1 |
| % of Total Pop. | 92.92 | 0.20 | 1.43 | 4.58 | 0.86 | 0.01 |
| 18+ | 8,596 | 16 | 120 | 394 | 67 | 1 |
| % of Total 18+ | 93.50 | 0.17 | 1.31 | 4.29 | 0.73 | 0.01 |

## DISTRICT No. 8

| Total Population | 13,793 |
|---|---|
| Deviation | 42 |
| Dev. Percentage | 0.31 |
| Total 18+ | 9,436 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 12,436 | 82 | 249 | 878 | 142 | 6 |
| % of Total Pop. | 90.16 | 0.59 | 1.81 | 6.37 | 1.03 | 0.04 |
| 18+ | 8,542 | 68 | 139 | 604 | 81 | 2 |
| % of Total 18+ | 90.53 | 0.72 | 1.47 | 6.40 | 0.86 | 0.02 |

## DISTRICT No. 9

| Total Population | 13,810 |
|---|---|
| Deviation | 59 |
| Dev. Percentage | 0.43 |
| Total 18+ | 9,382 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 12,343 | 86 | 292 | 940 | 146 | 3 |
| % of Total Pop. | 89.38 | 0.62 | 2.11 | 6.81 | 1.06 | 0.02 |
| 18+ | 8,460 | 58 | 167 | 603 | 92 | 2 |
| % of Total 18+ | 90.17 | 0.62 | 1.78 | 6.43 | 0.98 | 0.02 |

DISTRICT No. 10

| Total Population | 13,966 |
| Deviation | 215 |
| Dev. Percentage | 1.56 |
| Total 18+ | 9,383 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 12,401 | 290 | 387 | 429 | 440 | 19 |
| % of Total Pop. | 88.79 | 2.08 | 2.77 | 3.07 | 3.15 | 0.14 |
| 18+ | 8,414 | 177 | 238 | 263 | 282 | 9 |
| % of Total 18+ | 89.67 | 1.89 | 2.54 | 2.80 | 3.01 | 0.10 |

DISTRICT No. 11

| Total Population | 13,964 |
| Deviation | 213 |
| Dev. Percentage | 1.55 |
| Total 18+ | 9,778 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,245 | 671 | 494 | 870 | 672 | 12 |
| % of Total Pop. | 80.53 | 4.81 | 3.54 | 6.23 | 4.81 | 0.09 |
| 18+ | 8,109 | 394 | 288 | 541 | 438 | 8 |
| % of Total 18+ | 82.93 | 4.03 | 2.95 | 5.53 | 4.48 | 0.08 |

DISTRICT No. 12

| Total Population | 13,919 |
| Deviation | 168 |
| Dev. Percentage | 1.22 |
| Total 18+ | 9,604 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 10,825 | 902 | 589 | 903 | 677 | 23 |
| % of Total Pop. | 77.77 | 6.48 | 4.23 | 6.49 | 4.86 | 0.17 |
| 18+ | 7,718 | 546 | 350 | 544 | 439 | 7 |
| % of Total 18+ | 80.36 | 5.69 | 3.64 | 5.66 | 4.57 | 0.07 |

DISTRICT No. 13

| Total Population | 13,925 |
| Deviation | 174 |
| Dev. Percentage | 1.27 |
| Total 18+ | 9,402 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 12,898 | 188 | 264 | 312 | 260 | 3 |
| % of Total Pop. | 92.62 | 1.35 | 1.90 | 2.24 | 1.87 | 0.02 |
| 18+ | 8,810 | 112 | 166 | 168 | 143 | 3 |
| % of Total 18+ | 93.70 | 1.19 | 1.77 | 1.79 | 1.52 | 0.03 |

## DISTRICT No. 14

| | |
|---|---|
| Total Population | 13,928 |
| Deviation | 177 |
| Dev. Percentage | 1.29 |
| Total 18+ | 9,865 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 10,402 | 1,157 | 562 | 1,157 | 634 | 16 |
| % of Total Pop. | 74.68 | 8.31 | 4.04 | 8.31 | 4.55 | 0.11 |
| 18+ | 7,687 | 754 | 329 | 662 | 428 | 5 |
| % of Total 18+ | 77.92 | 7.64 | 3.34 | 6.71 | 4.34 | 0.05 |

## DISTRICT No. 15

| | |
|---|---|
| Total Population | 13,981 |
| Deviation | 230 |
| Dev. Percentage | 1.67 |
| Total 18+ | 10,286 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,339 | 527 | 516 | 851 | 739 | 9 |
| % of Total Pop. | 81.10 | 3.77 | 3.69 | 6.09 | 5.29 | 0.06 |
| 18+ | 8,574 | 347 | 324 | 532 | 504 | 5 |
| % of Total 18+ | 83.36 | 3.37 | 3.15 | 5.17 | 4.90 | 0.05 |

## DISTRICT No. 16

| | |
|---|---|
| Total Population | 13,751 |
| Deviation | 0 |
| Dev. Percentage | 0.00 |
| Total 18+ | 10,419 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,002 | 687 | 401 | 882 | 763 | 16 |
| % of Total Pop. | 80.01 | 5.00 | 2.92 | 6.41 | 5.55 | 0.12 |
| 18+ | 8,541 | 467 | 261 | 602 | 541 | 7 |
| % of Total 18+ | 81.98 | 4.48 | 2.51 | 5.78 | 5.19 | 0.07 |

## DISTRICT No. 17

| | |
|---|---|
| Total Population | 13,807 |
| Deviation | 56 |
| Dev. Percentage | 0.41 |
| Total 18+ | 9,615 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,333 | 472 | 447 | 591 | 953 | 11 |
| % of Total Pop. | 82.08 | 3.42 | 3.24 | 4.28 | 6.90 | 0.08 |
| 18+ | 8,048 | 295 | 297 | 351 | 621 | 3 |
| % of Total 18+ | 83.70 | 3.07 | 3.09 | 3.65 | 6.46 | 0.03 |

DISTRICT No. 18

| | | |
|---|---|---|
| Total Population | 13,876 | |
| Deviation | 125 | |
| Dev. Percentage | 0.91 | |
| Total 18+ | 10,549 | |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,415 | 287 | 458 | 663 | 1,040 | 13 |
| % of Total Pop. | 82.26 | 2.07 | 3.30 | 4.78 | 7.49 | 0.09 |
| 18+ | 8,902 | 187 | 310 | 434 | 711 | 5 |
| % of Total 18+ | 84.39 | 1.77 | 2.94 | 4.11 | 6.74 | 0.05 |

DISTRICT No. 19

| | | |
|---|---|---|
| Total Population | 13,859 | |
| Deviation | 108 | |
| Dev. Percentage | 0.79 | |
| Total 18+ | 11,230 | |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 9,696 | 662 | 797 | 1,685 | 997 | 22 |
| % of Total Pop. | 69.96 | 4.78 | 5.75 | 12.16 | 7.19 | 0.16 |
| 18+ | 8,266 | 485 | 557 | 1,195 | 714 | 13 |
| % of Total 18+ | 73.61 | 4.32 | 4.96 | 10.64 | 6.36 | 0.12 |

DISTRICT No. 20

| | | |
|---|---|---|
| Total Population | 13,915 | |
| Deviation | 164 | |
| Dev. Percentage | 1.19 | |
| Total 18+ | 10,167 | |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 7,265 | 1,864 | 1,101 | 2,683 | 979 | 23 |
| % of Total Pop. | 52.21 | 13.40 | 7.91 | 19.28 | 7.04 | 0.17 |
| 18+ | 5,788 | 1,244 | 698 | 1,772 | 659 | 6 |
| % of Total 18+ | 56.93 | 12.24 | 6.87 | 17.43 | 6.48 | 0.06 |

DISTRICT No. 21

| | | |
|---|---|---|
| Total Population | 13,933 | |
| Deviation | 182 | |
| Dev. Percentage | 1.32 | |
| Total 18+ | 9,704 | |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 10,949 | 1,176 | 601 | 651 | 538 | 18 |
| % of Total Pop. | 78.58 | 8.44 | 4.31 | 4.67 | 3.86 | 0.13 |
| 18+ | 7,853 | 717 | 357 | 389 | 380 | 8 |
| % of Total 18+ | 80.93 | 7.39 | 3.68 | 4.01 | 3.92 | 0.08 |

## DISTRICT No. 22

| | |
|---|---|
| Total Population | 13,863 |
| Deviation | 112 |
| Dev. Percentage | 0.81 |
| Total 18+ | 9,166 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 9,967 | 1,713 | 740 | 730 | 698 | 15 |
| % of Total Pop. | 71.90 | 12.36 | 5.34 | 5.27 | 5.03 | 0.11 |
| 18+ | 6,745 | 1,080 | 418 | 435 | 480 | 8 |
| % of Total 18+ | 73.59 | 11.78 | 4.56 | 4.75 | 5.24 | 0.09 |

## DISTRICT No. 23

| | |
|---|---|
| Total Population | 13,898 |
| Deviation | 147 |
| Dev. Percentage | 1.07 |
| Total 18+ | 9,323 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 9,524 | 2,422 | 949 | 544 | 444 | 15 |
| % of Total Pop. | 68.53 | 17.43 | 6.83 | 3.91 | 3.19 | 0.11 |
| 18+ | 6,567 | 1,554 | 575 | 328 | 294 | 5 |
| % of Total 18+ | 70.44 | 16.67 | 6.17 | 3.52 | 3.15 | 0.05 |

## DISTRICT No. 24

| | |
|---|---|
| Total Population | 13,805 |
| Deviation | 54 |
| Dev. Percentage | 0.39 |
| Total 18+ | 9,248 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,612 | 800 | 524 | 578 | 282 | 9 |
| % of Total Pop. | 84.11 | 5.80 | 3.80 | 4.19 | 2.04 | 0.07 |
| 18+ | 7,849 | 522 | 303 | 385 | 186 | 3 |
| % of Total 18+ | 84.87 | 5.64 | 3.28 | 4.16 | 2.01 | 0.03 |

## DISTRICT No. 25

| | |
|---|---|
| Total Population | 13,934 |
| Deviation | 183 |
| Dev. Percentage | 1.33 |
| Total 18+ | 9,153 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 12,589 | 272 | 333 | 480 | 253 | 7 |
| % of Total Pop. | 90.35 | 1.95 | 2.39 | 3.44 | 1.82 | 0.05 |
| 18+ | 8,363 | 153 | 186 | 292 | 157 | 2 |
| % of Total 18+ | 91.37 | 1.67 | 2.03 | 3.19 | 1.72 | 0.02 |

DISTRICT No. 26

| | |
|---|---|
| Total Population | 13,628 |
| Deviation | − 123 |
| Dev. Percentage | − 0.89 |
| Total 18+ | 8,669 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 12,418 | 106 | 312 | 659 | 126 | 7 |
| % of Total Pop. | 91.12 | 0.78 | 2.29 | 4.84 | 0.92 | 0.05 |
| 18+ | 7,976 | 62 | 169 | 388 | 68 | 6 |
| % of Total 18+ | 92.01 | 0.72 | 1.95 | 4.48 | 0.78 | 0.07 |

DISTRICT No. 27

| | |
|---|---|
| Total Population | 13,970 |
| Deviation | 219 |
| Dev. Percentage | 1.59 |
| Total 18+ | 9,000 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 12,880 | 121 | 244 | 634 | 90 | 1 |
| % of Total Pop. | 92.20 | 0.87 | 1.75 | 4.54 | 0.54 | 0.01 |
| 18+ | 8,403 | 62 | 127 | 349 | 58 | 1 |
| % of Total 18+ | 93.37 | 0.69 | 1.41 | 3.88 | 0.64 | 0.01 |

DISTRICT No. 28

| | |
|---|---|
| Total Population | 13,537 |
| Deviation | − 214 |
| Dev. Percentage | − 1.56 |
| Total 18+ | 8,810 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 12,568 | 60 | 249 | 553 | 105 | 2 |
| % of Total Pop. | 92.84 | 0.44 | 1.84 | 4.09 | 0.78 | 0.01 |
| 18+ | 8,260 | 38 | 128 | 326 | 58 | 0 |
| % of Total 18+ | 93.76 | 0.43 | 1.45 | 3.70 | 0.66 | 0.00 |

DISTRICT No. 29

| | |
|---|---|
| Total Population | 13,104 |
| Deviation | − 647 |
| Dev. Percentage | − 4.71 |
| Total 18+ | 9,206 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,982 | 114 | 225 | 613 | 162 | 8 |
| % of Total Pop. | 91.44 | 0.87 | 1.72 | 4.68 | 1.24 | 0.06 |
| 18+ | 8,500 | 85 | 139 | 371 | 108 | 3 |
| % of Total 18+ | 92.33 | 0.92 | 1.51 | 4.03 | 1.17 | 0.03 |

DISTRICT No. 30

| Total Population | 13,263 |
| Deviation | − 488 |
| Dev. Percentage | − 3.55 |
| Total 18+ | 9,611 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 10,392 | 704 | 425 | 1,210 | 519 | 13 |
| % of Total Pop. | 78.35 | 5.31 | 3.20 | 9.12 | 3.91 | 0.10 |
| 18+ | 7,685 | 479 | 267 | 781 | 387 | 12 |
| % of Total 18+ | 79.96 | 4.98 | 2.78 | 8.13 | 4.03 | 0.12 |

DISTRICT No. 31

| Total Population | 13,550 |
| Deviation | − 201 |
| Dev. Percentage | − 1.46 |
| Total 18+ | 9,810 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 10,489 | 858 | 516 | 1,362 | 303 | 22 |
| % of Total Pop. | 77.41 | 6.33 | 3.81 | 10.05 | 2.24 | 0.16 |
| 18+ | 7,805 | 519 | 336 | 932 | 212 | 6 |
| % of Total 18+ | 79.56 | 5.29 | 3.43 | 9.50 | 2.16 | 0.06 |

DISTRICT No. 32

| Total Population | 13,534 |
| Deviation | − 217 |
| Dev. Percentage | − 1.58 |
| Total 18+ | 9,238 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 8,348 | 2,585 | 971 | 1,109 | 509 | 12 |
| % of Total Pop. | 61.68 | 19.10 | 7.17 | 8.19 | 3.76 | 0.09 |
| 18+ | 5,904 | 1,744 | 599 | 638 | 345 | 8 |
| % of Total 18+ | 63.91 | 18.88 | 6.48 | 6.91 | 3.73 | 0.09 |

DISTRICT No. 33

| Total Population | 13,010 |
| Deviation | − 741 |
| Dev. Percentage | − 5.39 |
| Total 18+ | 8,431 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,648 | 224 | 230 | 762 | 141 | 5 |
| % of Total Pop. | 89.53 | 1.72 | 1.77 | 5.86 | 1.08 | 0.04 |
| 18+ | 7,669 | 128 | 144 | 408 | 80 | 2 |
| % of Total 18+ | 90.96 | 1.52 | 1.71 | 4.84 | 0.95 | 0.02 |

## DISTRICT No. 34

| | |
|---|---|
| Total Population | 13,160 |
| Deviation | −591 |
| Dev. Percentage | −4.30 |
| Total 18+ | 8,445 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 11,083 | 936 | 564 | 268 | 295 | 14 |
| % of Total Pop. | 84.22 | 7.11 | 4.29 | 2.04 | 2.24 | 0.11 |
| 18+ | 7,245 | 564 | 292 | 153 | 184 | 7 |
| % of Total 18+ | 85.79 | 6.68 | 3.46 | 1.81 | 2.18 | 0.08 |

## DISTRICT No. 35

| | |
|---|---|
| Total Population | 13,242 |
| Deviation | −509 |
| Dev. Percentage | −3.70 |
| Total 18+ | 8,445 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 4,927 | 87 | 142 | 8,034 | 49 | 3 |
| % of Total Pop. | 37.21 | 0.66 | 1.07 | 60.67 | 0.37 | 0.02 |
| 18+ | 3,632 | 66 | 72 | 4,639 | 33 | 3 |
| % of Total 18+ | 43.01 | 0.78 | 0.85 | 54.93 | 0.39 | 0.04 |

## DISTRICT No. 36

| | |
|---|---|
| Total Population | 13,346 |
| Deviation | −405 |
| Dev. Percentage | −2.95 |
| Total 18+ | 7,953 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 2,182 | 49 | 163 | 10,632 | 313 | 7 |
| % of Total Pop. | 16.35 | 0.37 | 1.22 | 79.66 | 2.35 | 0.05 |
| 18+ | 1,744 | 41 | 96 | 5,850 | 219 | 3 |
| % of Total 18+ | 21.93 | 0.52 | 1.21 | 73.56 | 2.75 | 0.04 |

## DISTRICT No. 37

| | |
|---|---|
| Total Population | 14,098 |
| Deviation | 347 |
| Dev. Percentage | 2.52 |
| Total 18+ | 8,289 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 2,267 | 21 | 120 | 11,611 | 75 | 4 |
| % of Total Pop. | 16.08 | 0.15 | 0.85 | 82.36 | 0.53 | 0.03 |
| 18+ | 1,659 | 14 | 67 | 6,498 | 49 | 2 |
| % of Total 18+ | 20.01 | 0.17 | 0.81 | 78.39 | 0.59 | 0.02 |

DISTRICT No. 38

| Total Population | 13,858 |
|---|---|
| Deviation | 107 |
| Dev. Percentage | 0.78 |
| Total 18+ | 8,566 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 2,719 | 58 | 122 | 10,837 | 109 | 13 |
| % of Total Pop. | 19.62 | 0.42 | 0.88 | 78.20 | 0.79 | 0.09 |
| 18+ | 2,028 | 34 | 75 | 6,353 | 71 | 5 |
| % of Total 18+ | 23.67 | 0.40 | 0.88 | 74.17 | 0.83 | 0.06 |

DISTRICT No. 39

| Total Population | 14,987 |
|---|---|
| Deviation | 1,236 |
| Dev. Percentage | 8.99 |
| Total 18+ | 11,554 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 8,086 | 688 | 973 | 3,886 | 1,342 | 12 |
| % of Total Pop. | 53.95 | 4.59 | 6.49 | 25.93 | 8.95 | 0.08 |
| 18+ | 6,539 | 573 | 852 | 2,396 | 1,182 | 12 |
| % of Total 18+ | 56.60 | 4.96 | 7.37 | 20.74 | 10.23 | 0.10 |

DISTRICT No. 40

| Total Population | 13,664 |
|---|---|
| Deviation | −87 |
| Dev. Percentage | −0.63 |
| Total 18+ | 9,399 |

| | NHwhite | NHblack | Hispanic | NHameri | NHasian | NHother |
|---|---|---|---|---|---|---|
| Group Total | 9,067 | 133 | 664 | 2,391 | 1,402 | 7 |
| % of Total Pop. | 66.36 | 0.97 | 4.86 | 17.50 | 10.26 | 0.05 |
| 18+ | 6,410 | 95 | 424 | 1,483 | 985 | 2 |
| % of Total 18+ | 68.20 | 1.01 | 4.51 | 15.78 | 10.48 | 0.02 |

APPENDIX G

IN THE SUPREME COURT OF
THE STATE OF ALASKA

ORDER

[Filed June 25, 1992]

Before: RABINOWITZ, Chief Justice, BURKE, MATTHEWS, COMPTON and MOORE, Justices.

On consideration of the petition for review, filed by the State of Alaska on June 22, 1992,

IT IS ORDERED:

1. The petition is GRANTED.

2. The court agrees with the arguments presented in

Parts V. C and V. B of the petition.

(a) The superior court's instructions to the Masters regarding the population from former District 17 were not required by the Voting Rights Act.

(b) The superior court erred in redrawing the Fairbanks House Districts to an extent not required by this court's order of remand of May 28, 1992.

3. The court rejects the argument presented in Part V. D of the petition. The superior court's configuration of the Western Alaska Districts involved does not violate the Federal Voting Rights Act. Senate District T results in a district having a fifty-one percent majority of Alaska Natives. There is no evidence of racially polarized voting in Senate District T. Further, there has traditionally been a very low voter turnout among the non-native military personnel and their dependents at Adak. House Districts 38 and 39 are superior on the state constitutional grounds of compactness and relative socio-economic integration to the state's proposed modifications of these districts.

4. The argument presented in Part V. A of the petition is mooted by our acceptance of the argument presented in Part V. C of the petition.

5. The relief requested by the intervenor Fish and Game Fund is DENIED. The configuration of Western Alaska does not violate the Federal Voting Rights Act. The modification requested by the intervenor would be suspect under the Voting Rights Act because it results in the loss of one Native influence senate district.

6. The interim plan adopted by the superior court is modified to reflect the changes required by our ruling in paragraph 2 of this order. These modifications are reflected in the map filed by petitioners with this court dated June 25, 1992. As modified, the superior court's interim plan is AFFIRMED.

7. The Lieutenant Governor is to conduct the 1992 primary and general elections pursuant to the interim plan as MODIFIED.

8. The cross-petition for review is DENIED.

9. The original application for relief filed on behalf of the Kodiak Island Borough is DENIED.

10. On remand, the superior court should extend filing and related deadlines as necessary for the conduct of the 1992 primary election.

11. This case is REMANDED to the superior court for further proceedings, including the entry of a final judgment in accordance with this order.

Entered by direction of the court at Anchorage, Alaska on June 25, 1992.

Clerk of the Supreme Court
/s/ Jan Hansen
Jan Hansen

[BURKE, Justice, concurring, and COMPTON, Justice, dissenting in part. The separate opinions are attached to this order.]

BURKE, Justice, concurring.

Although the views which I have expressed previously remain unchanged, I concur (1) in the decision to review, in part, the orders of the superior court, and (2) in the result. I will comment further when the court publishes its opinion.

COMPTON, Justice, dissenting in part.

I would revise the superior court's interim plan of June 19, 1992, as follows:

(a) Pair Election District 28 (Rural Mat–Su) with 35 (Interior Rivers);

(b) Pair Election District 29 (Chena–Denali) with 32 (South Fairbanks);

(c) Pair Election District 33 (Fox–Badger) with 34 (North Pole–Eielson).

These pairings would not require changes in any election district boundaries established by the plan. The objections of the State to the plan's configuration of Fairbanks are answered in part, as are the objections of the Mat–Su Borough plaintiffs to Governor Hickel's Proclamation of Reapportionment and Redistricting of September 5, 1991.

Under this court's revisions, one of the major objections of Mat–Su is silenced by once again separating Wasilla from Palmer, a result Mat–Su sought consistently to avoid. Mat–Su does not get even half a loaf for arguments which I consider well taken, while Fairbanks gets a whole loaf.

Rural Mat–Su arguably would prefer not to be joined with Interior Rivers, yet that problem can be addressed during preparation of a new plan. As long as it is to be separated from Chena–Denali, I believe its realignment with Interior Rivers preferable to the wholesale realignment that will result from the attachment of Chena–Denali to the Fairbanks area.

The changes I propose would not result in significant changes in total or native population figures, thus minimizing the overall deviation percentage figure and presumably enhancing the plan's potential for clearance by the United States Department of Justice. Furthermore, any question concerning racially polarized voting in former Election District 17 will be minimized by the continued pairing of Election District 6 (Prince William Sound) with Election District 8 (Soldotna–Seward).

# APPENDIX H

State of Alaska

1992 Interim
Reapportionment Plan
June 25, 1992